UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U. S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
4/7/2026
BY CDC
DEPUTY CLERK

Malachi Buswell )
   (PLAINTIFF) )
      )
   v. )    Case No.: **2:25-cv-874**
      )
Vt. Dep. of Corrections et al )
   (Defendant) )

\* TORT CLAIM \*
( Plaintiff is seeking a Bench Trial )


NowComes, Malachi Buswell, Pro-Se, pursuant to 28USCS§§2676-2680.


- PARTIES -

1.) Plaintiff('s): Malachi Buswell   D.O.B.:     /1984

  ADDRESS: NSCF, 2559 Glenn Road, Newport, Vt. 05855

  COUNSEL: Pro-Se; pursuant to: Faretta v. Cal.,422 U.S. 806,45 L.
Ed. 2d 562 (1975).


DEFENDANT('s): Vt. Dep. of Corrections et al

ADDRESS: Vt. DOC Central Office, NOB2 South, 280 State Drive
        Waterbury, Vt. 05671

COUNSEL: Vt. Attorney General's Offive, DOC Legal Dep.

ADDRESS: HC2 North, 280 State Drive, Waterbury, Vt. 05671-2080.


- JURISDICTION -

2.) In reviewing a jurisdictional motion (or Petition), "all
uncontroverted factual allegations of the complaint [are] accepted as
True and construed in the light most favorable to the nonmoving party".
((See: Mullinnex v. Menard, 2020 VT 33,8,212 Vt. 432, 236 A.3d 171
(2020)(Quoting: Conley v. Crisafuili, 2010 VT 38,3, 188 Vt. 11,13,999
A.2d 677)).

- PAGE 1 of 4 -

- CLAIM -

3.) I am currently being housed at NSCF in Newport, Vermont, for the sole purpose of Programming in the Vt. DOC's Risk Intervention Services Program (From hereon known as the R.I.S. Program), which I was Case-Staffed, from Central Office, to complete priot to my minimum.

DOC Case-Staffed me to program on my current charges, as follow:

A.) Franklin Unit, Criminal Division, Docket No.:1126-9-20Frcr, which I went to Trial on 2nd Degree Attempted Murder (Aquitted), and Aggravated Assault ((a)(5)), which is what I was Convicted of. This Charge 13VSA§1024(a)(5) carries a maximum of 5Years. I was sentenced to 4Y-1M TO 4Y-3M, which was extended to 4Y-40D TO 4Y-340D due to the DOC P.O. who did the PSI Investigation "COHERSING" the judge to prolong my sentence in order to make me PROGRAM. This is illegal as "Sentencing is solely the function of the Trial Court"(State v. Arbeitman, 131 Vt. 596, 131 A.2d 17, 1973 Vt. LEXIS 360).

B.) Chittenden Unit, Criminal Division, Docket No.:20-CR-01502, which I plead "No-Contest" to Reckless Endangerment (13VSA§1025) which carries 1 Year Maximum as the Misdomenor that it is.

C.) Docket No.: 20-CR-03567, out of Chittenden Unit, Crim. Div. had all Charges Dismissed with Prejudice.


5.) Mrs. Jill Raymond is the R.I.S. Program Director for NSCF in Newport, Vt., and she had me get on MAT Med's in order to participate in the R.I.S. Program. On 07/25/2025, I got on Suboxone/Subutex in order to be able to participate in the R.I.S. Program.

On 07/28/2025, I was dirrected to complete the (First) Accountability Statement in order to participate in the R.I.S. Program. On 08/21/2025, I was informed by my Caseworker, John Hardy, that Jill Raymond did not accept my First accountability Statement and dirrected me to fill out a second, and to be more indepth. I was not advised as to what to be "more indepth to", so I did my best.

- 5.) Continued -

On or about, 09/02/2025, I met with Mrs. Jill Raymond in her off. in the B-Building at NSCF. This is when she informed me that she is NOT going to permint me to "Participate in the R.I.S. Program", due to the fact that I have open Civil Cases in the Courts, such as Rule-75's and my 28USCS§2254, Tort Claims for both Denial of access to courts and Meaningful Papers, and for Denial of Religious Rights. If this Court requests I can provide the Docket No.'s in question at that time.

On 07/28/2025,I filled out and signed a Referal for I.R.S. Prog. with my Caseworker, John Hardy, here in NSCF, which is a "CONTRACT" between DOC and myself to participate in the R.I.S. Program. This is binding by Law in both directions.

Admin. Materials 13-130-020: Inmates"Shall" be afforded the opp. to participate in treatment programming while they have Criminal Conv. under appeal. ....

Inman v. Pallito, 2013 VT 94,195 Vt. 218,224,87 A.3d 499: Proves; CaseLaw has made clear, that an extreme abuse of discretion still must amopunt "to a practical refusal to perform a certain clear legal duty".

Town of Victory v. State, 174 Vt. 539(2002)(Mem): Using the word "Shall" generally makes that action "Mandatory".

13VSA§3052[Mandatory Duties]: Imposed mandatory duties upon DOC, by and through the Commissioner.

28VSA§601[Powers and Responsabilities of DOC Facility Super.]

28VSA§107[Offender/Inmate Records Request]

5USCS§552[Federal Freedom of Information Act(FOIA)]

12VSA§§5601-5606[Vt. Tort Claim Act]

28USCS§§2676-2680[Federal Tort Claim Act]

This Plaintiff vears for a Claim of Prima Facie Tort.... while not formally recognized in Vt.... arises where an individual intentio- nally causes harm to another.((Dasler v. Washington, 2025 Vt. Super. LEXIS 34)(Quoting: Fromson v. State, 2004 VT,¶ 19,176 Vt.395,848 A.2d 344)).

- PAGE 3 of 4 -

6.) "To succeed, the Dep. must demonstrate, "beyond doubt", that there exist no fact or circumstance that would entitle the Plaintiff to relief."(See: Wool v. Off. Pro. Regul., 2020 VT 44,8,212 Vt. 305, 301, 236 A.2d 1250).

This will be hard to do as I have included the Article from C.O. Ben Mitchell to the local paper known as "The Common" on Nov.6, 2024, Issue 789, hwere he explains he was FIRED for writing a POEM about DOC knowingly and willingly violating and deleating I/I's 504 Plans(IEP's).

And 28VSA§1b: Imposes a Mandatory Duty upon DOC to impliment and provide all I/I's treatment and Program, less those serving a Life w/ out Parole Sentence.(Which I am Not)

In fact, I have personally been demanding this R.I.S. program since February of 2025, after I was sentenced for all charges in Jan..


Wherefore, I hereby prey of this Honorable Court to provide, but not limited to, the following:

A.) Permit me to represent Pro-se as previously defined.; and

B.) Order the Defendant to pay me the Sum of $10,000,000.00 (Ten-Million Dollars), or the Sum in which this court deams to be substancial, as the Defendat keeps refusing to follow Vt, Superior Court Orders and I can prove this in writting and provide the Orders from the court which have been repeatedly, and still are being, violated!

Because this Defendant ONLY recognizes monetary actions against them, I prey this court provide a SUBSTANCIAL MONETARY Fine in my favor, as the Plaintiff, to be paid to me, as the Plaintiff.


Printed Name: Malachi A. Buswell

Signature: *Malachi A. Buswell*

Dated: 10/27/2025

Page 1 of 6

## Culpable Neglegance and Obstruction

• State v. Arbeitman, 131 Vt. 596, 313 A.2d 17, 1973 Vt. LEXIS 360:
    Sentencing is solely the function of the Trial Court. (Also see: State v. LeClair;
In re Lampman, 135 Vt. 226, 373 A.2d 547, 1977 Vt. LEXIS 592).

Also see: McGinnis v. United States, 452 F.2d 833;
• United States v. Chatman, 2024 U.S. App. LEXIS 29602;
• United States v. Cameron, 2021 U.S. App. LEXIS 28940;
• United States v. Wright, 2024 U.S. App. LEXIS 4305;
• United States v. Barnes, 2024 U.S. App. LEXIS 27377;
• Appeal - Calais v. Hall, 11 Vt. 494;

• Berkemer v. McCarty: Establishes an objective test for determining whether a suspect was subject to restraint comparable to those associated with a formal arrest. How a reasonable man in the suspects position would have understood his/her position or situation.

• First-Step-Act of 2018: Prevents Firearm Offenses that were charged in the same indictment as the first offense from counting as repeat offenses, effectively known as "Stacking". (U.S. v. Campbell, 2022 U.S. App. LEXIS 1930)

• United States v. Taylor, 816 F.3d 12; "Improper Convictions", No Jury is capable of finding the Defendant Guilty of something the evidence does not support beyond reasonable doubt.

• 13 VSA §14 [Lesser Included Offenses] (See: Price v. Georgia, 398 U.S. 323; State v. Carter, 2017 VT 32; and State v. Bean, 2016 VT 73)

• Sandin v. Conner, 515 U.S. 472 (1995) "A-Typical and Significant Treatment/Act"
• Wolff v. McDonnell, 418 U.S. 539 (1974) "Hardship on Prisoners (Undue Burden(s))"
• Cleggett v. Pate, 229 F. Supp. 818 (N.D. Ill, 1964) "Retaliation(s) against I/I's for filing Lawsuit against Prison Officials/Admin."

• Under Color of Law  • Protected Conduct  • Substancial Due Process
• Procedural Due Process  • Undue Burden  • Actions of Conjecture/Antiquity

V.R.A.P. Rule 21 [Extraordinary Relief]

PCR: V.R.Cr.P. 35 = 90 Days or less from sentencing // (13 VSA § 7131 Civ. Any Time)

Page 2 of 6

"_Access to Courts, Meaningful Papers, Legal Photocopies_"

• Bonds v. Smith, 430 U.S. 817: The Constitutional Right of Access to Courts and meaningful papers, required prison authorities to assist inmates in the preparation and filing of meaningful papers by providing prisoners with adequate libraries and assistance of counsel.

• Johnson v. Avery, Supra at 502: Requires "All Prison Officials" to at least allow I/I's assistance from their literate fellows. To aid and assist in the writing of Writs, Meaningful Documents, and other such documents.

• Young v. Gilmore, 404 U.S. 15: Indigent inmates must be provided, at the States Expense, with pens and paper to draft Legal documents, with notarial services to authenticate them, and with stamps to mail them. (This includes ribbons for Typewriters and such

V.R.E Rule 1002 - Requirement of Original
V.R.E Rule 1003 - Admissibility of Duplicates [Allows Photocopies only]

• Legal Photocopies must be provided; See: Burk v. Menard, 2017 Vt. Super LEXIS 792; Ladd v. Pallito, 2016 Vt. Super. LEXIS 11; Morales v. Donovan, 2023 Super LEXIS 30.

• Access to Courts; See: Montanzen v. Cueco, 361 Fed. Appx. 291; Lewis v. Casey, 518 U.S. 343; Bowdon v. Laughren, 386 F. 3d 88; Walker v. Senecal, 130 F. 4th 291; Davis v. Goord, 320 F.3d 346; Towne v. Hofmann, 184 Vt. 646;

• 12 VSA § 3951 [Unlawful Restraint]; 12 VSA § 3952 [Habeas Corpus];
• 13 VSA § 4950 [Habeas Corpus]; V.R. Civ. P. Rule 80.4 [Habeas Corpus];
• Vt. Const. Ch. 2 § 41 [Habeas Corpus];
• Vt. Const. Ch. 1, Act 4 [Remedy At Law Secured to All];
• Vt. Const Ch. 2 § 71 [Declaration of Rights Not To Be Violated]

• 13 VSA § 7553b [Speedy Trial Right] (Vt Const. Ch.2, Art 10) (US. Const. Amend 6)
• 13 VSA §§ 3006, 3007 [Neglect of Duty]; Obstruction of Justice = 13 VSA § 3015
• 13 VSA § 1305 [Cruelty by person having custody of Another], VI.DOC: Care and Custody of
• 13 VSA § 1455 [Hate Crime]. • 13 VSA §§ 2901, 2901c, 2902 [Perjury]
• 13 VSA §§ 3, 5 [Accessory Before/After the Fact] § 9 [Attempt]

Page 3 of 6

## Tort Claims                    (Per event/occurence)

- 12 VSA §§ 5601-5606 [Vt. Tort Claim Act] $5601(b) = $500,000 - 2 Million Approx. Total
- 28 USCS §§ 2671-2680 and § 1346 [Federal Tort Claim Act]

(Dosler v. Washburn, 2025 Vt. Super. LEXIS 34)(Quoting: Frumeun v. State, 2004 VT, ¶ 19, 176 Vt. 395, 848 A.2d 344): "This Plaintiff vears for a Claim of Prima Facie Tort... while not formally recognized in Vt., i.e. Do's as where an individual intentionally causes injury to another."

- Vt. Rules of Pro. Conduct [1.2, 1.3, 1.4, 2.3, 2.4, and 8.4 (Misconduct)] Applies to Attorneys
- Vt. Code of Judicial Conduct [Applies to Court Clerks and Judges Alike]
  - Maintaining the Intent of the Profession; The Act of - Intent

- Plain Error: An error so egregious and obvious as to make a derilict act in committing or permitting such an act, to occur or continue to occur. (Ray Charles consecit)

- Misprision: To commit a Felony, or allow a Felony to be committed; while owing Allegiance to a State or Government. [Vt. Const. Ch. 2 §56 (oath & Allegiance)]
  - 13 VSA § 3403 [Misprision] // 18 USCS § 2382 [Misprision] (Misprision is Treasun)

- 3 VSA §§ 1202, 1203 [State Code of Ethics]
- 3 VSA § 3052 [Mandatory Duties] (Applies to Vt. D.O.C. Commissioner, et al.)
- 28 VSA § 107 [Offender/Inmate Records Release] (DOC Directive/Policy # 251.01)
- 28 VSA § 601 [Powers and Responsibilities of DOC Facility Superintendents] (staff et al.)

- United States v. Sullivan, 118 F. 4th 170; Fraudulent Use of Federal Funding/Fraud (Programing Missuse Funds and Resrc.)

- VT. Constitution Chapter 1 : Article 3 [Religious Rights]; Art. 4 [Remedy At Law]; Article 10 [Criminal Proceedings Rights/Speedy Trial Right/Right to Counsel]
- Vt. Constitution Chapter 2 : § 38 [Jury Trial]; § 40 [Executive Bail/Bond]; § 41 [Habeas Corpus]; § 56 [Oath of Allegiance and Office]; § 66 [Citizenship] § 59 [Militias]; § 71 [Declaration of Rights Not To Be Violated]

- U.S. Constitutional Rights/Amendments :
Used in Civil Actions: Amendments 2, 5, 7, 8, and 14 (sections 1 and 5);
Used in Criminal Actions: Amendments 1, 4, 5, 6, 7, 8, and 14 (Sections 1 and 5);

Page 4 of 6

## - R.I.S. Program and Risk Containment -

- Directive #371.10 [Risk Containment] Authority: 28 VSA §§ 1, 101, 70], and 721.
- Directive #374 [RIS Program]; Authority: 28 VSA §§ 1, 101, 120; and 721-726.

- C.O. Ben Mitchell [DOC Educator] "The Common" (Issue #789) Dated: Nov. 6, 2024

(Even if Acquitted)
- 13 VSA § 7603: Charges are automatically sealed within 60 days of Final Disposition
- 13 VSA §§ 7602-7606 [Expungement/Sealing of Criminal Records]

- 28 VSA § 1(b): Imposes a "Mandatory Duty" upon Vt DOC. This does Not give DOC [Less there will Likely be Penalty] discretion to refuse or otherwise Neglect to develop and implement some Treatment program for each offer

- Admin. Material: CVR 13-130-020 [Access To Treatment Pending Appeal #365]
Inmates" Shall "be afforded the opportunity to participate in treatment programming which they have Criminal Convictions under appeal. Treatment, Assesment, Evaluations, screenings, and programming "Shall Not" be restricted or denied to inmates on the basis of any anticipated or pending direct or Collateral appeal of any criminal conviction, nor on the basis of any position taken by them in any such action. [This Applies to Any Lawsuit or PCR of any kind as well].

- Inman v. Pallito, 2013 VT 94, 195 Vt. 218, 224, 87 A.3d 499: Provides Prior Caselaw has made clear, that an extreme abuse of discretion still must amount "to a practical refusal to perform a certain and clear Legal Duty." [3 VSA § 3052 Mandatory Duties.

- Town of Victory v. State, 174 Vt. 539 (2002): Using the word "Shall" in a Statute generally means that action is "Mandatory". (Applies to Caselaw and Constitutions too.)

- In re Blow, 2013 VT 75: The Court ruled that the Petitioners' in ability to complete a rehabilitative program by the expiration of his minimum sentence, which was restored Following his successful challenge to the application of 28 VSA § 204 b, was not in of itself an Ex Post Facto Clause violation. It was at most a collateral consequence of a constellation of factors.

- Also see The following Caselaw regarding Programming: Racume vs State; Crawford v. State Mache v. Pallito, 198 Vt. 646; Taylor v. Pam!, 2024 Vt. Unpub. LEXIS 19; State v. Rivard, 2025 Vt. Unpub. LEXIS 12; A.J.T. v. Osseo Area Sch., Indep. Sch. Dist. No. 279, 145 Ct. 1647; Rose v. Touchette, 2021 Vt. 77; McLaughlin v. Baker, 2024 Vt. Super. LEXIS 138; (Vt. 2016). Favreau v. Pallito, 202 Vt. 655, 151 A.3d 343, 2016 Vt. Unpub. LEXIS 133, 2016 WL 3883202; State v. Arbettman, 131 Vt. 595, 312 A.2d 17, 1973 Vt. LEXIS 360 (1973); In re Blow, 2013 VT 75. Floyd v. Meachum, 907 F.2d 347

Page 5 of 6

Perjury by Prosecutor // Malicious Prosecution // Prosecutorial Misconduct // Obstruction of Justice
   • Obstruction of Administration of Justice, Perjury: Since at least 1935, it has been the established law of the U.S. that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution. This is so because, in order to reduce the danger of false convictions, courts rely on the prosecutor not to be simply a part in litigation whose sole object is the conviction of the defendant before him. The prosecutor is an officer of the Court has duty is to present a forceful and truthful case to the jury, not to win at any cost.

   • Shih Wei Su v. Filion, 335 F.3d 119: The Prosecution knowingly elicited false testimony from a coached witness. Outcome: Writ of Habeas Corpus was granted unless the State afforded the Def. a New Trial within 60 Days. (Also See: United States v. Bollard, 727 Fed. Appx __).

   • Thompson v. Clark, 596 U.S. 36: A Fourth Amend. Claim under 42 USC § 1983 for Malicious Prosecution did not require a Plaintiff to show that the criminal Prosecution ended with some affirmative indication of innocence. A Plaintiff was only required to show that the criminal Prosecution ended without a conviction.

   • Chiaverini v. City of Napoleon, 602 U.S. 556: When a government official brought multiple charges, only one of which lacked probable cause, the valid charges did not insulate the official from a Fourth Amendment Malicious Prosecution Claim per 42 USC § 1983 relating to the invalid charge. The valid charges did not create a categorical bar.

   • 13 VSA § 7031 [Form of Sentences; Min and Max Terms]: Section (b)(1): The period of credit for concurrent and consecutive sentences shall include all days served from the date of arraignment or the date of earliest detention for the offense, whichever occurred first, and end on the date of sentencing. Only a single credit shall be awarded in cases of consecutive sentences, and no credit for one period of time shall be applied to a later period. [Earliest Detention is your arrest to ____
      • 13 VSA § 7032 [Consecutive sentences]; • 13 VSA § 7033 [Commitment for different offenses on one mittimus]
      • 13 VSA § 7044 [Sentence Calculation; Notice to Def.] (Falls back on 13 VSA § 7031)
      • State v. Perry, 2014 VT 102: Under VT Stat. Ann. tit. 13 § 7032, a mittimus ordering that Def. not recieve credit for Time Served in connection with prior convictions improperly imposed denied him credit for Time Served. The amendments to the Statutes were intended to give defendents credit without regard to whether the Time Served was connected to the offense being sentenced.

   • V.R. Civ. P. Rule 75 [Governmental Action]; Rule 65 [Injunctions];
   • Rule 74 [Erroneous Sentence / PCR]; 60.1 [Expedited Action ($5000 Limit)] (No awardings.)

Page 6 of 6

## Writ Presentations/Compositions

• In reviewing a jurisdictional motion (or Petition), "all uncontroverted Factual allegations of the complaint [Are] accepted as True and construed in the light most favorable to the nonmoving party" ((See: Mullinnex v. Menard, 2020 VT 33, 8, 212 Vt. 432, 236 A.3d 171(2020)(Quoting: Cooley v. Crisafulli, 2020 VT 38, 3 188 Vt. 11, 13, 999 A.2d 677)). [The Plaintiff is the "Nonmoving Party's unless they put forth a Motion, or Request, of something in excess of the original Petition ]

• "To succeed, the Department must demonstrate, "beyond doubt", that there exist no fact or circumstance that would entitle the Plaintiff to relief."(See: Wool v. Off. Proi Reg 2020 VT 44, 8, 212 Vt. 305, 310, 236 A.2d 1250).

• 4 VSA 327 b: "I declare that the above statement is True and Accurate to the best of my knowledge and belief. I understand that if the above statement is false, I will be subject to the penalty of perjury or to other sanctions in discreth of the Court. [Double Space: Printed Name; Signature; Dated ]

✳Also See the following Case Laws:
  • Pehush v. Ashworth, 757 Fed. Appx. 47; Green v. U.S. 355 U.S.8
  • Beck v. Ohio, 379 U.S. 89; Gilles v. Repicky, 511 F.3d 239.

  Caselaw, establishing the 4 pronged Test for Speedy Trial Violation:
  • Baker v. Wingo,
  • State v. Brillon,
  • State v. Recor,

  • V.R.Civ.P. Rule 79.1 [Pro-Se Representation/Appointment/Recusal of Coun.
  • Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L. Ed. 2d 562 (1975).

  • 28 USCS § 2254 [Habeas Corpus of State I/I in Supreme/Fed. Court, 2255 = Federal I/I − 42 USC §§1983 Gov. Action Suit −

  VRE • In re Watts, 2024 VT 48 (Misconduct of Counsel.) Personal Counsel, Prosecution Ala 613 Prior Statements// Witness = V.RE 608 Character//615 Exclusion of Witness
  • Medical Care of I/I's = 28 VSA §§801 − 8016 / 401 Relevant Evidence
  VRE 1005 − Public Records // V.RE 802 Hearsay // 504 Spouse Privilege

Risk Intervention Services (RIS) activities are structured to support your success in the community and help you with the skills to keep yourself out of jail by not committing a new crime.

**Who**: RIS is for those who are assessed with higher needs correlated with increased risk to reoffend.

**What**: Services can include instruction and practice in education, vocation, and behavioral health. This may include classes, group sessions, and individual support to prepare you to be successful at home and work.

**Where**: You will participate at a facility which is best able to address your assessed needs.

**When**: Except for prelease services, services are offered as capacity permits. Prerelease services are typically a minimum of 14 months prior to projected eligible release. Those designated High Risk or classified as Risk Containment generally are centrally staffed for prerelease approximately 20 months prior to their maximum sentence. Some begin or continue services as part of their community-based conditions.

**Why**: The goal of RIS is to address the thoughts and actions which may lead you to commit a crime.

**How:** RIS Plans. Service plans may differ from participant to participant. They are built to meet your individual risks and needs. Your RIS Plan outlines the services you are required to participate in and can include school, groups, and work-related activities.

**Notes**

_____

_____

_____

_____

_____

**Vermont Department of Corrections**



**Risk Intervention Services Handbook**

November 2024

Risk Intervention Services wants you to be better off when you return to your community. Learning, practicing, and using the **Better Offs** here and at home show that you are in control of your life. We believe you will be better off by habitually using Coping Skills, Respect for Others and Self-Regulation. These **Better Offs** are outlined below:

## Coping Skills

I choose to:

♦ Own my actions and use my skills.
♦ Manage my feelings and know when to ask for help.
♦ Value healthy behaviors for myself and others and avoid compulsive and harmful behaviors in myself and others.

## Respect for Others

I choose to:

♦ Use words with respect, knowing sometimes people will not be won over.
♦ Act with fairness, knowing that others may have different expectations than mine.
♦ Make space for the free will of others.

♦ Value each person's feelings, even when I don't understand or agree.

## Self-Regulation

I choose to:

♦ Be polite and friendly.
♦ Make and accept interpersonal boundaries.
♦ Control my feelings, words, and actions.
♦ Follow rules and laws.
♦ Care for my mental and physical health by asking for help when I need it.

## Expectations

**Attendance**: You are expected to attend and be prepared and on time for all scheduled services. Being prepared includes being dressed appropriately and bringing completed homework assignments or any materials needed for that service.

**Communication**: RIS shares information about participants with DOC staff as needed. This includes speaking about your progress in services and your behavior outside of services.

**Rules**: While in RIS, you are expected to follow all local facility or P&P rules. You are also expected to not behave in any way related to offending, which leads you closer to offending, which hurts others, or which gets in the way of others participating in RIS.

**Supportive Accountability Plans (SAP)**: When a RIS participant's behavior does not match up with expectations, they may be placed on a Supportive Accountability Plan (SAP). SAPs are meant to support you in preventing the problem from continuing or happening again. While a participant is on a SAP, they may be required to complete additional work and/or work on their goals with RIS.

**Transitions**: RIS will work with you to prepare for transitions between DOC sites. This includes continuing services in the community when you are released from jail.

**Accountability**: Those required to participate in prerelease services will address the behaviors related to their risks.

WSOC Staff Initial: _____

**Facility Risk Intervention Services (RIS)**
**Referral Checklist**

Incarcerated Individual Name: __Boswell, Malachi__    Referral Date: __7/28/25__

Incarcerated Individual DOB: _ __/1984__    Jacket #: __BO350__

---

Include and check each box confirming that **ALL** the information in this section is in the appropriate section of OMS (see Staff Guidance for more details).

☒ I/I has been convicted of a Listed Offense (refer to Casework Manual for requirements)

☒ Date of recent ORAS-PIT assessment OR override date: __2/3/2025__

    Check which applies: ☐ Moderate  ☒ High  ☐ Override

☒ Copy of Interest Form, signed by I/I and staff member

☒ I/I notified they have been referred to education for further evaluation as required by RIS

☒ SSISA

☒ Police affidavit(s) describing listed offense(s), as well as any other documents which describe the offense(s)

---

**ANY SEX OFFENSE CONVICTION**

**Is there a current or past sex offense conviction? YES _____ / NO _✗___**

**If yes,** include and check the appropriate box confirming the information listed below is in OMS or submitted via email:

☐ Police affidavit(s) describing <u>instant and past</u> sexual offense(s), and any other documents describing the offense(s)

    ☐ Check here if these documents are old and/or unavailable at time of referral

☐ Date of most recent VASOR assessment if applicable OR override date: _____

    Check which applies: ☐ Low  ☐ Moderate-Low  ☐ Moderate-High  ☐ High  ☐ Override

☐ Date of most recent Static-99 assessment if applicable OR override date: _____

    Check which applies: ☐ Low  ☐ Moderate-Low  ☐ Moderate-High  ☐ High  ☐ Override

---

**ANY CONVICTION RELATED TO INTIMATE PARTNER VIOLENCE   YES _____ / NO _✗___**

**If yes,** include and check the appropriate box confirming the information listed below is in OMS or submitted via email:

☐ Police affidavit(s) describing the offense(s), and any other documents describing the offense(s)

    ☐ Check here if these documents are old and/or unavailable at time of referral

☐ Date of most recent DVSIR assessment OR override date: _____

    Check which applies: ☐ Medium  ☐ High  ☐ Override

---

**The following documentation must be included if it is applicable to this offender. Circle N/A if Not Applicable. Check off all that apply, confirming the documentation is in its appropriate OMS location.**

☐ Pre-Sentence Investigation.
    (N/A)

☐ ALL ADA requests and determinations as of date of referral are in OMS
    (N/A)

☐ Probation warrants and conditions
    (N/A)

☐ Violation of Probation Affidavit
    (N/A)

☐ Treatment Summary by outpatient treatment provider
    (N/A)

☐ Copy of Release of Information (ROI) referencing above provider
    (N/A)

Continued on back

☒ **If under 3 years from release, or sentenced to 1-3 years,** include a detailed written statement of responsibility by the offender in his own words and handwriting when possible. Statement must reference listed offense(s) and offender's own description of conduct, and must be included in the referral email. *Minimal statements like "I stole a car" would not be adequate.*

Referring Caseworker, Printed Name: _JOHN HARDY_     Facility: _NSCF_

Referring Caseworker, Signature: _____     Direct Phone: _802-334-4003_

*NOTE TO STAFF: Please note, ALL incomplete referrals (including those with missing or mislabeled documentation OMS, missing checked boxes above, missing signatures, etc.) will be returned to the Referring Caseworker immediately. RIS will not consider these referrals until a completed referral is submitted.*     *May 2023*

**VT DOC**
**Risk Intervention Services Interest Checklist**

The Vermont Department of Correction's Risk Intervention Services (RIS) are structured activities that have been integrated to support sentenced Incarcerated Individuals who are at a moderate to high risk of committing new crime by presenting them with the skills to be successful in Vermont communities. Services can include group and individual behavioral health, educational, and vocational training services using evidence-based interventions proven to be effective in helping adults who want to live successfully in their communities.

Your agreement to participate may include additional assessments, orientation sessions, and/or preparatory activities. Those required to participate in integrated services and planning before your release to the community who refuse to participate in the integrated RIS Plan may not be eligible to participate in voluntary services available through RIS.

Please write your name in print on the line below which you most agree.

**I want to participate in RIS.**

I, _Malah A. Buswell_, wish to participate in RIS. I understand my choices and behaviors can impact my eligibility to engage in RIS, and I will demonstrate I am ready to make a positive change in my life.

**I do not wish to be considered for RIS.**

I, _____, do not wish to be considered for RIS planning. There will be a minimum waiting period of six months; I will be eligible to re-apply for RIS in five months. With this decision, I also understand I will be considered "non-case plan compliant." This could impact my release and other factors relating to my incarceration/supervision/case management.

**I no longer want to participate in RIS.**

I, _____, no longer wish to participate in RIS planning and services. I am voluntarily withdrawing myself. There will be a minimum waiting period of six months; I will be eligible to re-apply for RIS in five months. With this decision, I will be considered "non-case plan compliant." This could impact my release and other factors relating to my incarceration/supervision/case management.

Signature: _Malah A. Buswell_        Date: _07/28/2025_

I will not Dismiss my 28 USCS §2254 or my Rule 75's

Staff Signature: _____

Staff Name: _____ John Hard/ _____

☐ Incarcerated/Supervised Individual Refused to review and/or sign the document.

Additional Staff Witness Signature: _____

Additional Staff Witness Name: _____

Revised May 2023

**VT DOC Risk Intervention Services**
**Incarcerated Individual Accountability Statement**

Incarcerated Individual Name: _Malachi A. Buswell_

Incarcerated Individual DOB: _1984_    PID #: _80350_

The goal for RIS participants is to learn and demonstrate prosocial skills that would assist them in not committing new crime. You will be expected to talk about your behaviors and continue to develop accountability throughout your time in RIS.

Expectations for Accountability Statement:
1. Make an honest effort to describe your actions that led to criminal conviction(s) and brought you to Risk Intervention Services (RIS).
   - Please focus on the specific behaviors you engaged in that harmed others or your community rather than behaviors of other people or details of the court proceedings.
   - What is/was the relationship you had with those who were harmed?
   - If you have a history of substance misuse, this can be helpful for the RIS team to know, but it should not be the main focus of your statement.
   - If you have more than one instance of criminal activity, focus on the most severe crime (often a listed offense) and account for each conviction you are currently sentenced with. This will help identify any patterns in your behaviors that led to crime.
2. Please tell us how you think RIS can help you to prevent yourself from doing these behaviors in the future.

**Conviction(s) and Accountability Statement:** Use the area below and on the back of this form to provide a handwritten statement. If you need more room, please attach additional pages. If you need help writing your statement, please let us know who helped you.

Pursuant to Franklin Unit, Criminal Division, Superior Court for the Docket No.: 1126-9-20 Frcr; I was Found Guilty of Agg. Assault (13 USA§1024) due to Abuse of Discretion by Obstruction of Justice as the Victims Clearly and Concisely Testified the Perpotrator of this Crime had a Face and Neck Tattoo; No Hand Tattoo's; and only one arm covered with Angel and Demon Tattoos! None of which I have. My VT. D.O.C. Tattoo Profile proves All of my Tattoos pre exist to the event of this alleged crime. So I filed a 28 USC §§ 2254! Pursuant to Chittenden Unit, Criminal Division, Superior Court Docket No.: 20-CR-060 I plead out to Reckless endangerment (13 USA§1025) which is not a programmable offense. All other charges were Aquitted and it would be a 5th Amendment and therefore 8th Amendment Violation to try to make me admit to them. ( See you in Court if you Try! I refuse to change my statement ( I am hereby invoking 28 USA§1097)

**VT DOC Risk Intervention Services**
**Incarcerated Individual Accountability Statement**

If I am not accepted for telling the Truthful Facts as I can evedencially prove then you are committing Obstruction of Justice (13 VSA § 3015) Through your Neglect of Duty (13 VSA § 3006) and there fore Misprission (13 VSA § 3403 and 18 USCS § 2382)! I will bring this to the Federal Supreme Court. Affiduvits do not prove anything, especially when I was aquitted by a Jury! Pursuant to 28 VSA § 107 I want/need a Full Copy of both pages of this Document for Court! (I here by enter this as my Statement Pursuant to my U.S. Constitutional 14th Amendment Right)

I have met with MAT personel today in order to be reinduced as not to relaps during the R.I.S. Group. I also have open cases, my Rule-75: and my Federal Habeas Corpus 28 USCS § 2254 open that I Will Not dismiss to be provided access to this Group that Vt. D.O.C. said is Mandatory. To Attempt to Force me to dismiss these Legal Redresses I have Filed, would Violate my Constitutional Rights pursuant to U.S Const. Amend's 1, 5, 7, 8, and 14! To run this Group off of Affidavits instead of Proven Facts is also unconstitutional.

**Statement of Understanding:** I understand the statement above will be used in determining my placement in services and referenced while in Risk Intervention Services.

Incarcerated Individual Signature: _Malachi. A. Buswell_    Date signed: _07/28/2025_

Staff Signature: _____    Date signed: _9/30/2025_

Staff Name: _John Hardy_

*This is the Second Remission of this ad - J. Raymonds Request*

**VT DOC Risk Intervention Services**
**Incarcerated Individual Accountability Statement**

Incarcerated Individual Name: Malachi A. Buswell    (Date 08/21/2025)

Incarcerated Individual DOB: _____/1984_____ PID #: 80350_____

The goal for RIS participants is to learn and demonstrate prosocial skills that would assist them in not committing new crime. You will be expected to talk about your behaviors and continue to develop accountability throughout your time in RIS.

Expectations for Accountability Statement:
1. Make an honest effort to describe your actions that led to criminal conviction(s) and brought you to Risk Intervention Services (RIS).
   - Please focus on the specific behaviors you engaged in that harmed others or your community rather than behaviors of other people or details of the court proceedings.
   - What is/was the relationship you had with those who were harmed?
   - If you have a history of substance misuse, this can be helpful for the RIS team to know, but it should not be the main focus of your statement.
   - If you have more than one instance of criminal activity, focus on the most severe crime (often a listed offense) and account for each conviction you are currently sentenced with. This will help identify any patterns in your behaviors that led to crime.
2. Please tell us how you think RIS can help you to prevent yourself from doing these behaviors in the future.

**Conviction(s) and Accountability Statement:** Use the area below and on the back of this form to provide a handwritten statement. If you need more room, please attach additional pages. If you need help writing your statement, please let us know who helped you.

On 08/19/2025, my N.S.C.F. Caseworker, John Hardy, came to my cell,#8,

in CA Unit, to inform me that my R.I.S. Program(Risk Intervention Services)

Incarcerated Individual's (I/I) Accountability Statement was not acceptable by the

R.I.S. Program Coordinator in N.S.C.F., Jill Raymond.

John Hardy, my caseworker here at N.S.C.F. in Newport, Vt. stated that

"Jill Raymond said Less Legal Jargon and more Facts, you can't have Criminal Cases

open while participating in the R.I.S. Program".

Pursuant to my Constitutional Rights (VT and US) and this States own

Statutes, of which this State Entity operates under, pursuant to the "Mandatory

Legal Duties", as put forth by this States Legislature, Mrs. Jill Raymond has ﹏﹏

**VT DOC Risk Intervention Services**
**Incarcerated Individual Accountability Statement**

infact knowingly and willingly violated all such Mandatory Duties and my Constituting

Rights (VT and US). I have a Rule 75 open in Franklin Civil Unit, and I have an

open Habeas Corpus (28USCS§2254) in the Civil Division of the Vermont District Court

Court in Burlington, Vt. (Pertaining to a wrongful Criminal Prosecution). this is

NOT a Criminal Docket (Case) in either petition to either court. This is as the Law

is concerned, therefore, Vt.D.O.C. as a State Entity has to recognize this in the

same light and definitions.

As for taking Accountability, it is illegal, immoral, unprofessional,

and unconstitutional to tell/make anyone admit to something they did not do! The

fact that I plead out to Docket No.:20-CR-01502, Pleading "No Contest" does not in

any way make me guilty of an action. Infact, you can check with the State's Attorney

Attorney in that Docket, I only plead "No Contest" to save myself and This State

the headache of Trial because This State screwed up and did not provide me a

competent Attorney, I was actually forced to Represent Myself (Pro-Se). This is

after I had proven my Competency, Biology, and Sanity in court pursuant to the

Courts order, in Docket No.:1126-9-20 Frcr in Franklin Crim. Unit. In this Docket

all three (3) victims Identified Jeremya Philips (Who looks nothing like me) as the

culprit whom assaulted them. I was wrongfully convicted because I was forced to

**Statement of Understanding:** I understand the statement above will be used in determining my placement in services and referenced while in Risk Intervention Services.

Incarcerated Individual Signature: _Malachi A. Buswell_   Date signed: _08/21/2025_

Staff Signature: _____   Date signed: _08/27/2025_

Staff Name: _John Hardy_

Revised May 2023   Page 2 of 2

**VT DOC Risk Intervention Services**
**Incarcerated Individual Accountability Statement**

represent myself in this Docket as well, and I told the Judge to go Fuck Herself.

Due to this, Judge Alison Arms intentionally abused her professional discretion,

in much the same way Mrs. Jill Raymond does in this Program.

When Mrs. Jill Raymond does not accept the Facts for what they actualy

are, when I/I's [are] actually taking accountability for their actions, she is in

the legal deffinition, committing Obstruction of Justice913VSA§3015) through her

Neglect of Duty(13VSA§3006). She does so while owing allegiance to this State of Vt

which is therein called Misprision (13VSA§3403 and/or 18USCS§2382) which I will be

taking to court in the Supreme (Federal) Court. Where I will be demanding that Both

Mrs. Jill Raymond and the Commissioner be charged as 3VSA§3052. As I am factually

one of the Victims of Mrs. J. Raymond under duress of these aforementioned crimes

which have violated my 8th amendment of the US Const. and other such Const. Rights.

Since Mrs. J. Raymond wishes me to be forthcoming, I am Jill Kennedy's

son; you know her today as Jill Biden. She is married to my father Joe Biden and

she is the eldest daughter of J.F.K., which is why when I was 18, I convinced my

cousin (Aunt Jean's Niece from her First mairrage) Sheryl and her husband Gill to

adopt me so I would not be forced to deal with my family whom left me in S.R.S.

care at the age of 11. After being dragged around the country by Joe's Foster

**Statement of Understanding:** I understand the statement above will be used in determining my placement in services and referenced while in Risk Intervention Services.

Incarcerated Individual Signature: *Micheal A. Buswell* Date signed: 08/21/2025

Staff Signature: _____ Date signed: 8/27/2025

Staff Name: _____ John Hardy _____

Revised May 2023

Page 2 of 2

**VT DOC Risk Intervention Services**
**Incarcerated Individual Accountability Statement**

sister, Sally, whom got paid to look after me at that time. At the age of 8 I had

destroide Joe's Bayonnette playing Pirates with Sallies Son Mat-Mat. When I was 6

I went back to South GlennsFalls N.Y. to see my Grandmother Norrah Biden, in the

assisted living home that my father and uncle Jim (James) left her in. About a

year or so prior to that I staid at Gramdma Norrah's house in Glennsfalls N.Y. and

she did not want me sleeping upstairs in Bue and Hunters old room. She felt it was

tainted or haunted some how. Judge Linda Davis was the Family Court Judge whom

procided over my adoption at my request, being that she is a friend of my family.

Now lets get back to whats at hand, 28VSA§1(b) imposes a "Mandatory

Duty" upon D.O.C.. This does not give DOC discretion to refuse or otherwise neglect

the development or implementation of some treatment program for Each Offender(Less

those sentenced to Life without)(See: Town of Victory v. State, 174 Vt. 539(2002).

This brings light to 3VSA§3052 (Mandatory Duties), and the other prior

named Statutes that have been violated through the intentional, knowing and willing

actions of Mrs. Jill Raymond.

Keep in mind; in reviewing jurisdictional motion (or Petition), all

uncontroverted factual allegations of the complaint [are] accepted as TRUTH and

construed in the light most favorable to the nonmoving party. (See: Mullinnex v.

Menard, 2020 VT 33, 8, 212 Vt. 432, 236 A.3d 171(2020)(Quoting:Conely v. Crisauili, 2010 VT 38, 3, 188 Vt. 11, 13 99 A.2d 677).

**Statement of Understanding:** I understand the statement above will be used in determining my placement in services and referenced while in Risk Intervention Services.

Incarcerated Individual Signature: _Mahnki A.Buswell_    Date signed: _08/21/2025_

Staff Signature: _____    Date signed: _8/21/2025_

Staff Name: _John Hardy_

Revised May 2023    Page 2 of 2

**VT DOC Risk Intervention Services**
**Incarcerated Individual Accountability Statement**

_ः_         This means; To be successful, the department must demonstrate "Beyond

Doubt that there exist no facts or circumstance that would entitle the Plaintiff to

relief"; (See: Wool v. Off. Pro. Regul., 2020, VT 44, 8, 212 Vt. 305, 310, 236 A.3d

1250(Internal Quotationa Omitted)).

Inman v. Pallito, 2013 VT 94, 15, 195 Vt. 218, 224, 87 A.3d 499:Proves

CaseLaw has made clear that an extreme abuse of discretion still must amount to a

practical refusal to perform a certain legal duty.

Your problem hear is I have already done this, see the aforementiond,

I can also prove that Mrs. Jill Raymond is abusing the Federal Funds provided for

DOC to run and opperate the R.I.S. Program. She makes all of these I/I's take this

Program with the understanding that they will be released at their minimum or soon

there after. However, after these I/I's complete this Program, she has these I/I's

Risk Contained. This is called Fraud as she is doing this for the Financial gain

for her employer through the Federal Funding provided to This State Entity for such

I/I's that participate in the Program, then again on another front for I/I's that

are not eligible for release. (See:United States v. Sullivan, 118 F.4th 170). Mrs.

Jill Raymond and the Commissioner WILL both see 10-15 years of Federal Incarceration

for each I/I affected in this manner. I can PROVE many of them and I will be taking

**Statement of Understanding:** I understand the statement above will be used in determining my placement in services and referenced while in Risk Intervention Services.

Incarcerated Individual Signature: _Makachi A. Buswell_      Date signed: _08/21/2025_

Staff Signature: _____                    Date signed: _8/21/2025_

Staff Name: _____JOHN HARDY_____

**VT DOC Risk Intervention Services**
**Incarcerated Individual Accountability Statement**

such matters to the Federal Courts where this State of Vermont can NOT cover this

all up for you. I have the family and connections that this State has forgetten I

have. I will pursue this to the Senate if I have to. Infact I am contacting a few

friends out of State whom will make sure this goes to the Federal Courts if I

continue to be violated and repressed (Harassed) with these such matter in which I

am wrongfully denied programming of which I have REQUESTED myself.

I will not rewrite this. Instead the next action I take is taking you

to court and naming myself as YOUR VICTIM. Good Day and God Speed.

P.S. My family are all WASP's (White Anglo-Saxon Prodestants) Starting

with my Great Great Grandfather whom Ruled over Ireland (Vre-Foy Clan).

Stop pushing me, I've chosen to be humble and remain in the shadows

thus far. You do not want to be the reason I Piss off my Family. I will make sure

they all know it is all your fault when I take everything in the Public Light. I am

built for this, you are not.

Pursuant to 28VSA§107, I am stating here and now I Need a Copy of this

for court. It is now your Legal Obligation to see to the fact that I am afforded a

full copy of this document.(ALL 6 PAGES) *Six pages* MB

**Statement of Understanding:** I understand the statement above will be used in determining my placement in services and referenced while in Risk Intervention Services.

Incarcerated Individual Signature: _Mark A. Berwell_    Date signed: _08/21/2025_

Staff Signature: _____    Date signed: _8/27/2025_

Staff Name: _John Hardy_

Revised May 2023    Page 6 of 6

~ ( Page 1 ) ~

# Prison Educator Fired For Writing a Poem

By Ben Mitchell, The Commons



Wednesday, November 6, 2024 — Issue 789

On Oct. 24, I was fired by the Vermont Department of corrections for having written a poem: Elegy to Gary Partridge. Partridge was a student of mine at Southern States Correctional Facility who died in September from an infection he had had for over a year. I hadn't published the elegy or shared it with the public in any way, but I read it to the prison's creative writing class, and that was enough. Certainly this begs the question: what is so threatening in what I wrote?

At first glance, it would appear my offensive theme was the suggestion that WellPath, the private contractor who took over healthcare in the Vermont prison system last year, is rationing care in such a way that leads to unnecessary death. However, there is no question that that is certainly the case. When Governor Phil Scott and Commissioner Nicholas J. Deml hired Wellpath, they were aware of WellPath's long history of denying care in ways that lead to death. Senator Elizabeth Warren is leading a congressional investigation into Wellpath as I write this: squeezing profit at the expense of patient care is the Wellpath brand.

In my opinion, the truly threatening aspect of what I wrote is the suggestion that Risk Intervention Services and the "Clinical Services" model currently practiced in VT is being used to systematically violate the Americans with Disabilities Act. The Elegy exposes the way Risk Intervention Services uses their clinical tools to selectively add years to the sentences of people with divergent neurology.

According to their materials, "Risk Intervention Clinical Services employs Evidenced Based Principles for working effectively with offenders ... on coping skills, substance abuse, offense specific situations, anger and aggression, and healthy relationship skill development." The "Clinical Services" described boil down to a series of photocopied self reflective exercises used to determine an individual's likelihood to "reoffend." These services are then used to decide who can take advantage of programs like good time, early release, parole and probation which include support for housing and employment.

Over the summer of 2023, I noticed a pattern of incarcerated people with divergent neurology - Dyslexia, ADHD, Autism, being denied access to accommodations during "Clinical" programming. I witnessed a number of hyperactive students - not allowed medication - being thrown out of programming for executive function challenges and restlessness. Furthermore, I saw incarcerated individuals on the Autism spectrum penalized for their social pragmatics.

In one particularly frustrating instance, a dyslexic man who could not read the xeroxed forms had requested several times to be allowed accommodations under the Americans with Disabilities Act. His lack of reading had led him to fail programming in the past. When time came, he told them he did not feel comfortable to start programming without accommodations for his reading. Rather than helping this individual gain the requested accommodations, guaranteed by federal law, the service provider documented the individual as "refusing court mandated programming" thus adding two years to his sentence. His request for reasonable accommodations increased his sentence.

Let's dig a little deeper into the "Clinical" system practiced by VT DOC. If an incarcerated person is not accomplishing the goals of the "Clinical" programming, they create a Corrective Action Plan or CAP. A CAP is a list of specific steps the individual must take to address their shortcomings. The CAP is the system by which incarcerated individuals can

1

Exhibit #8

be removed from programming. When I went through the entire list of incarcerated individuals who had been placed on CAPs statewide, I found some alarming statistics. 60% of Individuals on CAPs had a history of special education. Even more alarming however was that of that 60 % only 12% had any kind of ADA accommodations noted in their file. Of those 12% I could not find one who had received any kind of accommodations during programming.

At that time, I shared these statistics with my supervisor, who brought them to the attention of Risk Intervention Services. My hope was that we could find a way to help incarcerated individuals with divergent neurology, better access the programming that was supposed to help them reduce their chances of recidivism. Since that time, however, the ADA and 504 processes have been taken over by an administrator with no background in special education who is removing information from the records.

One particularly glaring example is an individual who is exceptionally bright, but has deficits in reading, math, spelling and social pragmatics. This individual was homeschooled, so he has no school records or formal diagnosis. After being thrown out of programming twice, a team of special educators wrote a 504 plan to help explain his sometimes bizarre, interpersonal behavior to the service providers. Rather than address the accommodations suggested in the 504, an administrator deleted the 504 from the system. Someone has decided to keep him in incarcerated as long as possible. Rather than allowing him to go through the system which would provide support for re-entry into the community, he will hit his maximum and get dropped at the bottom of the driveway.

So, am I saying that the Vermont Department of Corrections is systematically executing autistic sex offenders? No. The evidence is correlational at best. I am saying, however, that being neuro divergent significantly increases your likelihood of dying in prison in Vermont.

Grievance Form 1                                        Grievance #:

# EMERGENCY & INFORMAL COMPLAINT FORM

Emergency Grievance Filing Timelines: as soon as possible | Staff Response: supervisor response within 8 hours
If emergency is outside of your authority to address, please forward to Shift Supervisor
Informal Grievance Filing Timeline: within 10 business days from incident | Staff Response: within 48 hours
If the informal complaint is outside of your authority to address, please forward to Shift Supervisor

## Grievant (Section 1)

Grievant Name: Malach. A. Buswell    DOB: _____ /1984
(Print name)

Facility/Field Office: N.S.C.F    Living Unit: CA #8 Date: 07/02/2c 25

Please check all that apply to your emergency grievance:

☐ Staff Misconduct ☐ Threat of Death or Injury ☐ Threat of Disruption of Facility or Field Operations
☐ A need for Speedy Resolution to ensure Meaningful Action is Possible.

Issue/Complaint:
Yesterday I met with J. Raymond the R.T.S. Program Coordinator,
She told me I am not allowed to participate in the Groups. I spoke with
my Caseworker John Hardy today and these facts were Confirmed.
This is Neglect and therefore a violand unusual Punishment.
I was ordered to set in the MAT program to participate in this R.T.S. group.

Grievant's Proposed Solution:
I would to be provided a Treatment Mitigram which reduces my
Accudion, this is my childeged or Constitutional Right.

## Staff (Section 2)

Receiving Staff Print and Sign: _____ Date: 1/1/5 Time: 145
**Is this an emergency?** ☐ Yes ☒ No
Supervisor Signature: _____ Date: / Time: _____
(Correctional staff printed name & signature)

**Please process as an informal complaint if the grievance is not an emergency.**
Does this grievance meet the eligibility requirements of the Grievance Policy 320.01?
☐ Yes ☐ No **If no, return to the individual with explanation for ineligibility.**

Response from Staff: _____
_____
_____
_____

Responding Staff: _____ Date: _____ Time: _____
(Correctional staff printed name & signature)

## Grievant (Section 3)

I agree to the Plan for Resolution ☐ Yes ☐ No

Grievant's Signature: _____ Date: _____ Time: _____

*If you are not satisfied with the response, file a formal grievance within fourteen (14) business days of receiving this response and attach a copy of this informal grievance.*
CC: two copies to the grievant, one copy to Grievance Coordinator for data entry into OMS.
Date revised 11//2022

Grievance Form 2                    Grievance #:

## FORMAL GRIEVANCE SUBMISSION FORM

Formal Grievance Filing Timelines: within 14 business days of the informal resolution Staff Response: within 20 business days of formal filing

### Grievant (Section 1)

Grievant Name: Malachi A Baswell                    DOB: _____ /1961

Facility/Field Office: N.S.CF                    Living Unit: CF 37 Date: 07/20/2025

### Did you file an informal complaint about this issue?
Yes ☑ With whom? CCI Noel    When (date)? 07/19/2025 (attach informal complaint)

No ☐ Please file an informal complaint on this issue.

### Describe your Formal Grievance Below:
Describe: I am opposed to that the ___ Program in Oct 2025 ___
I have open Civil cases ___ (5 and 2cu.s 2054) Mr. Jilly
has made it clear he will NOT print any IP Law for any open Civil Petil
which violates every Iaa U Const Amend 1, 5, 7, 8, and 14 Rights. the V
___ ___ "37" clearly states an ___ must have an open Civil Case
This does not include Civil Act. ___ Rule 6; Rule 75; 1983; PCR, ___ Habeas Corpus.
T, Ced VI DOC makes it beyond clear that any I/2 can ___ participate
in Programer could they ___ req ___ to do so. M; VI ___ ___
___ ___ Jill ___ a ___ ___ ___
m VI Con ___ A, 4 R ___ ___ I II Reqmented ___
the only ___ I can participate in programming without Fear of Retaliation

### Staff (Section 2)

Did you accept this grievance: Yes ☑ No ☐ If No, Why? _____

Staff Member Receiving Grievance: _____ Date: _____ Time: _____
                              (Print and Sign Name)

Supervisor's Response: _____
_____
_____
_____
_____
_____

Supervisor's Signature: _____ Date: _____ Time: _____

### Grievant (Section 3)

I agree to the Plan for Resolution ☐ Yes ☐ No
Grievant's Signature: _____ Date: _____ Time: _____

CC: two copies to grievant, one copy to Grievance Coordinator for data entry into OMS.

Date revised 11/2022

Grievance Form 1                    Grievance #:

## EMERGENCY & INFORMAL COMPLAINT FORM

Emergency Grievance Filing Timelines: as soon as possible | Staff Response: supervisor response within 8 hours
If emergency is outside of your authority to address, please forward to Shift Supervisor
Informal Grievance Filing Timeline: within 10 business days from incident | Staff Response: within 48 hours
If the informal complaint is outside of your authority to address, please forward to Shift Supervisor

**Grievant (Section 1)**

Grievant Name: Malachi A. Buswell                    DOB: _____ /1984
                (Print name)
Facility/Field Office: NSCF          Living Unit: CB-39 Date: 07/19/2025

Please check all that apply to your emergency grievance:
☑ Staff Misconduct ☐ Threat of Death or Injury ☐ Threat of Disruption of Facility or Field Operations
☑ A need for Speedy Resolution to ensure Meaningful Action is Possible.

Issue/Complaint:
I am supposed to start the R.I.S. Program in October of 2025, However, I have been informed by Jill Raymond (R.I.S. Program) That I can Not have any open case whether its a Criminal or Civil (65-75-1983-PCR- or Habeas Corpus) they must all be resolved prior to starting program. This is Highly Illegal and Unconstitutional. It is also a D.O.C. depriving me of Access to the Courts and Meaningful Papers.

Grievant's Proposed Solution:
Due to the blatent Obstruction of Justice (13 VSA§ 3015) and therefore Misprision 13VSA§3403 and 18USC§§2382) by Mrs. Jill Raymond, of which has violated my Const. R.'s pursuant to U.S Const. Amend. 1, 7, 8, and 14 (aswell as Amend. 5) and Vt. Const. Ch.28 71, I am well within my Right to invoke Vt.Const. Ch.1 Ad 4, which I am. I want Jill Fired Now.

**Staff (Section 2)**

Receiving Staff Print and Sign: Col NOEL                    Date: 07/19   Time: 1638
                        Is this an emergency? ☐ Yes ☐ No
Supervisor Signature: _____   Date: _____   Time: _____
                (Correctional staff printed name & signature)

Please process as an informal complaint if the grievance is not an emergency.
Does this grievance meet the eligibility requirements of the Grievance Policy 320.01?
☐ Yes ☐ No If no, return to the individual with explanation for ineligibility.

Response from Staff: ~ Submit a request form to Jill RAYMOND

Responding Staff: CØl NOEL                    Date: 07/19   Time: 1638.
                (Correctional staff printed name & signature)

**Grievant (Section 3)**

I agree to the Plan for Resolution ☐ Yes ☑ No

Grievant's Signature: Malachi A. Buswell          Date: 07/19/20   Time: 16:30

*If you are not satisfied with the response, file a formal grievance within fourteen (14) business days of receiving this response and attach a copy of this informal grievance.*

CC: two copies to the grievant, one copy to Grievance Coordinator for data entry into OMS.
Date revised 11//2022



# wellpath
## To hope and healing.

# Health Services Request

Name (Nombre): **Malachi A. Buswell**    Patient ID# (Numero de ID): **80350**

DOB (Fecha de nacimiento): **/1984**    Housing Location (Localidad): **CB #39**

Please describe why you want to be seen (Describe por qué quieres que te vean):

I am respectfully requesting to be seen by The M.A.T. Program Provider for this Facility, Please and Thank you. (I have a prior diagnosys of Opioid Dependency Disorder)

Patient Signature (Firma de paciente): *Malachi A. Buswell*

Date/Time (Fecha/Hora): **07/25/2025**

## To be completed by healthcare staff:

**Received:**

Date: 7-28-25    Time: 0000    Signature: SH

Triage: ☐ Emergent  ☐ Urgent  ☒ Routine    Date/Time: 7-28-25    Initials: SH

Type of Request: ☐ Medical/Medico   ☐ Mental Health/Salud Mental    ☐ Dental
☒ Medication Assisted Treatment (Detox)/ Programa de desintoxicacion
☐ Other/Otro: _____

Face to Face Interaction?    ☐ Yes  ☒ No

Findings: _____

Immediate Intervention needed? ☐ Yes  ☐ No  If yes, explain: _____

Scheduled with:    ☐ Nurse  ☐ Provider  ☐ Mental Health  ☐ Dental  ☐ Other _____

Response to Patient/Comments: Scheduled for sick call

Treatment plan should not be noted above but documented on appropriate treatment forms.

QHP Signature: _____    Date/Time: _____

QHP Printed Name/Title: _____

| Form Folder and Number: Health Request Forms HF03.2 | Form Owner: Mary Ann Wollet | Accreditation: All | Active / Last Revision Date: January 10, 2023 | Page 1 of 1 |
|---|---|---|---|---|

 **wellpath**
To hope and healing.

# Health Services Request

Name (Nombre): Molah A Buswell          Patient ID# (Número de ID): 80350

DOB (Fecha de nacimiento): ____/____/1984      Housing Location (Localidad): CB #39

Please describe why you want to be seen (Describe por qué quieres que te vean):

I am respectfully requesting to be seen by the M.A.T. Program Provider for this Facility, Please and Thank you. (I have a prior diagnosis of Opioid Dependency Disorder)

Patient Signature (Firma de paciente): Molah A. Buswell

Date/Time (Fecha/Hora): 07/25/2025

**To be completed by healthcare staff:**

**Received:**

Date: _____    Time: _____    Signature: _____

---

**Triage:** ☐ Emergent  ☐ Urgent  ☐ Routine      **Date/Time:** _____    **Initials:** _____

**Type of Request:** ☐ Medical/Medico    ☐ Mental Health/Salud Mental    ☐ Dental
☐ Medication Assisted Treatment (Detox)/ Programa de desintoxicacion
☐ Other/Otro: _____

**Face to Face Interaction?**    ☐ Yes  ☐ No

Findings: _____

**Immediate Intervention needed?** ☐ Yes  ☐ No  If yes, explain: _____

**Scheduled with:**    ☐ Nurse  ☐ Provider  ☐ Mental Health  ☐ Dental  ☐ Other _____

**Response to Patient/Comments:**

_____
_____
_____

Treatment plan should not be noted above but documented on appropriate treatment forms.

QHP Signature: _____    Date/Time: _____

QHP Printed Name/Title: _____

| Form Folder and Number: | Form Owner: | Accreditation: | Active / Last Revision Date: | Page 1 of 1 |
|---|---|---|---|---|
| Health Request Forms HF03.2 | Mary Ann Wollet | All | January 10, 2023 | |



**wellpath**
To hope and healing.

# Health Services Request

Name (Nombre): **Malachi A. Buswell**    Patient ID# (Numero de ID): **80350**

DOB (Fecha de nacimiento): **4    /1984**    Housing Location (Localidad): **CB #24**

**Please describe why you want to be seen (Describe por qué quieres que te vean):**

I need to Provide a U.A. for M.A.T (A.A.P). I need to get back on MAT Meds before I start Program soon. This U.A. is a requirement to be seen by the M.A.T Provider. Please Call me up to fullfil the obligation. Thank you

Patient Signature (Firma de paciente): *Malachi A. Buswell*

Date/Time (Fecha/Hora): **07/30/2025**

---

**To be completed by healthcare staff:**

**Received:**

Date: _____    Time: _____    Signature: _____

---

**Triage:** ☐ Emergent  ☐ Urgent  ☐ Routine    **Date/Time:** _____    **Initials:** _____

**Type of Request:** ☐ Medical/Medico    ☐ Mental Health/Salud Mental    ☐ Dental
☐ Medication Assisted Treatment (Detox)/ Programa de desintoxicacion
☐ Other/Otro: _____

**Face to Face Interaction?**    ☐ Yes  ☐ No

Findings: _____

**Immediate Intervention needed?** ☐ Yes  ☐ No  If yes, explain: _____

**Scheduled with:**    ☐ Nurse  ☐ Provider  ☐ Mental Health  ☐ Dental  ☐ Other _____

**Response to Patient/Comments:**

_____
_____
_____

Treatment plan should not be noted above but documented on appropriate treatment forms.

QHP Signature: _____    Date/Time: _____

QHP Printed Name/Title: _____

| Form Folder and Number:<br>Health Request Forms HF03.2 | Form Owner:<br>Mary Ann Wollet | Accreditation:<br>All | Active / Last Revision Date:<br>January 10, 2023 | Page 1 of 1 |
| --- | --- | --- | --- | --- |

State of Vermont
Department of Corrections
Northern State Correctional Facility

**Incarcerated Individual Request Form**

To: Jill Raymond (R.I.S. Program)
(Name and Title of Staff Member)

Date: 08/30/2025

SUBJECT:    (State Briefly, but completely, the problem on which you desire assistance.)

Pursuant to 28USA§107 and other such Statutes such as those of which elisate a "Mandatory Duty", such as but not limited to: 3USA§3052 28USA§1, 101, 120, 721-726; CVR 13-130-020; 13USA§§3006, 3007; and many others; as well as Vt. Constitution Chapter 1, Article 4 and Ch. 2§71 I have a legal Right to be provided all responces in writins thus its your Mandatory Duty.

ACTION REQUESTED:    (State exactly how you believe your request may be handled, what you think Should be done.)

I am respectfully requesting, pursuant to these above aforementioned State Statutes and Constitutional Rights, a written response to why I am not being allowed to participate in the "Federally Funded" Risk Intervention Service Program. I know I am legally allowed to participate in this group of which I have requested to participate in. I have a photocopy of this for Court! — Thank you for your time and efforts. —

Malachi A. Buswell #80350          CA #8          Malach A. Buswell
(Print Name Here)                  (Living Unit)    (Signature of Requester)

DISPOSITION:    (Staff Response.)

We met.

(Signature of Staff)          9/2/25 (Date)



**wellpath**

To hope and healing.

## Health Services Request

**Name** (Nombre): _Malachi A Buswell_ **Patient ID#** (Número de ID): _5035_

**DOB** (Fecha de nacimiento): _ /1984_ **Housing Location** (Localidad): _CA #6_

**Please describe why you want to be seen** (Describe por qué quieres que te vean):

_I explained to MAT that I only got back on the MAT (Suboxone/Subutex) in order to get into the R.I.S. Program, as I was directed to. Jill Raymond is refusing to allow me to participate in R.I.S. Therefore I stopped taking the MAT Meds_

**Patient Signature** (Firma de paciente): _Malachi A Buswell_

**Date/Time** (Fecha/Hora): _09/02/2025_

---

**To be completed by healthcare staff:**

**Received:**

Date: _____  Time: _____  Signature: _____

---

**Triage:** ☐ Emergent  ☐ Urgent  ☐ Routine        Date/Time: _____        Initials: _____

**Type of Request:** ☐ Medical/Medico  ☐ Mental Health/Salud Mental  ☐ Dental
☐ Medication Assisted Treatment (Detox)/ Programa de desintoxicación
☐ Other/Otro: _____

**Face to Face Interaction?**    ☐ Yes ☐ No

Findings: _____

**Immediate Intervention needed?** ☐ Yes ☐ No  If yes, explain: _____

**Scheduled with:**    ☐ Nurse  ☐ Provider  ☐ Mental Health  ☐ Dental  ☐ Other _____

**Response to Patient/Comments:**

_____

_____

_____

Treatment plan should not be noted above but documented on appropriate treatment forms.

QHP Signature: _____  Date/Time: _____

QHP Printed Name/Title: _____

| Form Folder and Number: | Form Owner: | Accreditation: | Active / Last Revision Date: | Page 1 of 1 |
|---|---|---|---|---|
| Health Request Forms HF03.2 | Mary Ann Wollet | All | January 10, 2023 | |

**Grievance Form 3**                    Grievance #:

# DECISION APPEAL TO COMMISSIONER

Facility: _N.S.C.F_                    Field Office: _____

This form may be used to file an appeal of a grievance decision to the Commissioner of Corrections. Attach all previous DOC decisions and any other documentation.

State briefly why you are not satisfied with the response to your grievance appeal which was dated:

On 7/20/2025, I filed my #2 Grievance with C.C.II Lavelle when signed it on 7/20/2025 at 15:36. Regarding being denied R.I.S. Program because I have open Civil Cases (Rule 75; 28USC§2254; and a Tort Claim) which Clearly violates CVR 13-130-020; 28VSA§1(w); 3VSA§3052; and many other Statutes. Jill Raymond has also made it clear I will need to Admit to Charges I was acquitted of and other charges of which were dismissed with prejudice by the State. In doing so she has knowingly and willingly violated my 1st, 5th, 7th, 8th and 14th U.S.Const.Rights. Furthermore, I can prove, in writing, Jill Raymond required me to get on MAT Meds to participate in the R.I.S Program. I have an addiction to Opiates and had priorly gotten myself clean of Suboxone/Subutex/Methidone. Now I am Detoxing because I Never wanted to be on these Addictive Meds that DOC Forced me to take in order to participate in RIS, which Jill Raymond denied to me after Forcing me to get re-addicted to Opiates as she required. These Actions are Highly Immoral, Unethical, Unconstitutional, Unprofessional, and a Clear violation of Irman v. Pallito, 2013VT94 and other such Case Law, Statutes, and Constitutional Rights. Such as but not limited to, U.S. Const 8th Amend. and Vt. Const. Cl. 2§71. Wherefore, Pursuant to Vt.Const.Cl.2 Art4 12VSA§§5601-5606; and Vt. State and Federal Civil Habeas Corpus Rights I want to be release

See below if your grievance has been deemed ineligible by the Central Office Grievance Coordinator:

_____

_____

_Malachi A. Buswell_ #80350 // Malachi A. Buswell ( ___/1984)
Signature of Grievant                    Print name & DOB

Date appeal submitted: _09/04/2025_

Mail to: Department of Corrections, NOB 2 South, 280 State Drive, Waterbury, VT 05671-2000

Date revised: 11/2022

*[margin note, handwritten vertically:]* ...Absolved and Expunged with prejudice. This is not a request. I will take # To Court!

November 4, 2024

To Whom it May Concern:

Malachi Buswell, DOB  /1984, was inducted on the MAT program on 10/6/2022 had received Medication Assisted Treatment and took his MAT medication as prescribed.

Patients dose was titrated to 16mg dose. Referral submitted for OTP visit for Methadone Treatment assessment. Patient transitioned to Methadone Treatment. Patient reported Methadone Treatment did not work for him. Patient was transitioned back to Buprenorphine. Patient was transferred to SSCF from NWSCF. Patient requested to taper and discontinue MAT medication prescription. Per MAT Provider Treatment note, patient's dose was tapered to 2mg. Patient stopped taking his MAT medication prescription. Patient was transferred back to NWSCF. Patient requested to be re-inducted on to the MAT program. Patient called down to medical to meet with provider. Per MAT Provider Treatment note, patient refused to come to medical. As of 11/4/2024, patient is not on the MAT program.


Lisa Goulette
MAT Case Manager
NWSCF
3649 Lower Newton Road
Swanton, VT 05488



✱ Statements, under Oath or Affirmation, by Victims and Officers ✱
That I, the Defendant, will be calling as Witnesses at Trial.

Page 6 of 8

- "Axon - Body - 2_2020-09-13_0148": Pages 5 to 9;
Paige Demarse Describes, In full, Shawn Poulin as assailent, Alexis's Husband.

- "Axon - Body - 2_Video 2020 - 09 - 13 _ 0123": Taylor Bushey - "Never Saw Older Male".

- "Axon - Body - 2_Video 2020 - 09 - 13 _ 0106": Mr. Owen Pelkey
Older Male is 6' - 6' Plus, with Neck and other Tattoos; Page 13 and 14.
Identifies, Jeremy Phillips, as Older Male, assailent. Page 19
(Jeremy Phillips was in Vt. D.O.C.'s custody at the time.)

- "Axon - Body - 2_Video 2020 - 09 - 13 _ 0156": Mr. Owen Pelkey
Identifies Older Male with having Neck, Right Arm, Face, Chest Tattoos; Page 26.

- "Axon - Body - 2_Video 2020 - 09 - 12 _ 2359":

  - Owen Pelkey: Silver or Grey Ford Escape took Right (Dead End).

  - Taylor Bushey: Saw Female but not Male(s); S.U.V. - Tan, Beige - ish in Color.

  - Ofc. Cadorette: By "older", they meant 29 or 30; (S. Poulin was 31 at that Time.)

- "Axon - Body - 2_Video 2020 - 9 - 13 _ 0003:

  - Cpl. Fuller: So, the Escape is not Stolen. It's just what they took off in.

- (Jason Sixen, Foster Brother, had a Ford Edge, Not an Escape!
Silver w/ Black Bumpers, Front and Back. (Not Painted))

FILED: 12/18/2020 9:41 AM
Vermont Superior Court
Chittenden Unit
20-CR-03567

DEFENDANT: Malachi A Buswell
DOB: 1984 AGE: 36
ADDRESS
Clover Lane
Burlington VT 05408

ARRAIGNMENT DATE: September 28, 2020
SA CASE ID.: 20-14565
ASSIGNED (D)SA: Kelton Olney Esq. ERN:
POLICE DEPT.: South Burlington Police Department
INVESTIGATING OFFICER: Cpl. Kevin Grealis
VICTIM ADVOCATE: Kathyria Ferrer-Rodriguez
INCIDENT NO.: 20SB008879

## STATE OF VERMONT

CIVIL OR CRIMINAL
UNIT CONFIDENT UNIT

STATE OF VERMONT                    CRIMINAL DIVISION

DOCKET NO. **20CR3567**

MALACHI BUSWELL

## INFORMATION BY STATE'S ATTORNEY

By the authority of the State of Vermont, the State's Attorney for Chittenden County, upon the oath of office charges

### COUNT 1 OF 1

CHARGE CODE: 23V1094B , CODE ID: FS , OFFENSE CLASS: F
CHARGE NAME: VEHICLE OPERATION-WITHOUT OWNER CONSENT/AGGRAVATED

Malachi L Buswell in the County of Chittenden, at South Burlington on or about September 13, 2020, knowingly used the motor vehicle of another without consent of the owner and the motor vehicle was recovered within 24 hours of the time it is determined the theft occurred, regardless of whether the person abandons the stolen vehicle outside of Vermont, in violation of 23 V.S.A. 1094.

Penalty: Imprisonment not more than 2 years or a fine of not more than $1,000 or both.

Against the peace and dignity of the State.

DATED: September 28, 2020

Referrals if applicable: -
Diversion Tamarack X No Referral – Reason: Based

No information has been presented to grand jury

DATED      10/1/2021

CASE #: 20SB008879

### SOUTH BURLINGTON POLICE DEPARTMENT
### AFFIDAVIT OF PROBABLE CAUSE
### STATE OF VERMONT

**SUPERIOR COURT**
**CHITTENDEN UNIT**

**Criminal Division**
**Docket Number:**

**State of Vermont**

**V.**

**Malachi Buswell (      /1984)**
Now comes Detective Cpl. Kevin Grealis, affiant, being duly sworn and on oath deposes and says they have probable cause to believe Malachi Buswell (     /1984) has committed the crime of:

a. <u>Aggravated Operation without owners consent</u> in violation of Title <u>23</u> V.S.A. <u>1094(B)</u>

*On 09/13/2020 complainant Jason Sizen (       /1986) reported to the South Burlington Police that his 2005 Ford Edge had been stolen. Sizen advised the only other person who had a key to the vehicle was a friend of his, Malachi Buswell (      /1984). Sizen advised the last time he saw the vehicle was on 09/11/2020 and he could not get ahold of Buswell and Buswell did not have permission to have the vehicle. Buswell was the suspect in a shooting in South Burlington, VT which occurred on 09/11/2020. Sizen's vehicle was entered into NCIC. On 09/16/2020 the Allen County Sheriff's Department in Indiana located Sizen's vehicle in their jurisdiction and it had been set on fire with a male and female seen leaving the area. A short time late Buswell and his girlfriend, Alexis Lesage (       /1998) were apprehended in DelKab County Indiana in a vehicle which had been stolen from Indiana.*

1. On 09/13/20 at approximately 0132 hours, Jason Sizen DOB:       /1986 contacted SBPD and spoke with Officer Morse regarding his vehicle being stolen.

2. Sizen advised that in the afternoon hours on 09/11/2020 his 2005 silver Ford Escape was stolen from his friends home, who lives at 331 Lime Kiln Rd. Sizen advised that the only person who had a spare key to the vehicle was a male identified as Malachi Buswell DOB:       1984. Sizen advised that he had not been in contact or seen Buswell in a week and a half and he was now not returning Sizen's calls or text messages.

3. Sizen advised that the vehicle had plates that were registered to his old vehicle so they would not show as being registered. The vehicle was last seen as having a VT registration of GTN147. Sizen advised that Buswell is his foster brother and had the spare key in case of emergencies but Sizen did not give Buswell permission to take his vehicle. Sizen advised the VIN for the vehicle is 1FMYU94175KA62064.

4. 09/14/2020 Detective Crispin and I met with Jason Sizen at his residence regarding his vehicle being stolen. Additionally, I was investigating a shooting which occurred on 09/11/2020 in which Malachi Buswell was the suspect (20SB008827). 09/11/2020 is the same day that Sizen reported he believed his vehicle had been stolen.

*P. 8 of 9*

# ARREST WARRANT

**ST. ALBANS POLICE**

**STATE OF VERMONT
FRANKLIN COUNTY**

Now Comes **Det/Sgt Francis J. McCarty**, Affiant, being duly sworn and on oath, deposes and says he has probable cause to believe that **Malachi Buswell DOB: /1984** (hereinafter referred to as "Buswell") has committed the offence of **Attempted Murder, A violation of Title 13 VSA 9 (b).**

> *Sizen advised that the vehicle had plates that were registered to his old vehicle so they would be PNA. The vehicle was last seen as having a VT registration of GTN147.*
> *Sizen advised that Buswell is his foster brother and had the spare key in case of emergencies but Sizen did not give Buswell permission to take his vehicle. NCIC entry is currently pending awaiting a statement and stolen vehicle form."*

15. On September 14, 2020, Jason Sizen's vehicle was entered into NCIC.

16. While on shift September 13, 2020, Cpl. Keith Cote of SAPD saw that Buswell was stopped by Milton Police Department on September 4, 2020. He requested pictures of Buswell from the traffic stop. Pictures were sent of Buswell which shows tattoos up his arm and on his chest and spotted across his body. It also shows that he is skinny and muscular.

17. On September 16, 2020 St. Albans Police received a call from DeKalb County Sheriff's Office in Indiana. They said that the vehicle stolen from Vermont had been recovered but it was set on fire. They also advised that Buswell and Lesage were in custody.

18. I received a report Deputy Mathew Haber from DeKalb Sheriff's Office. He states in part that he had received a call of a vehicle all over the road. The vehicle was described a blue Volvo with Vermont plates. He located the vehicle and made contact with the occupants at a gas station. He said the license plate (GRN436) came back no return. He ran the vehicle identification number and the vehicle came back as stolen out of Allen County, Indiana. Buswell and Lesage were taken into custody.

Subscribed and Sworn to before me on

This ²² day of September 20 20

_____

**(Notary Public)**

_____
**(Affiant)**

8/22/202
**(Date)**

## ARREST WARRANT

**ST. ALBANS POLICE**

**STATE OF VERMONT**
**FRANKLIN COUNTY**

Now Comes **Det/Sgt Francis J. McCarty**, Affiant, being duly sworn and on oath, deposes and says he has probable cause to believe that **Malachi Buswell DOB: /1984** (hereinafter referred to as "Buswell") has committed the offence of Attempted **Murder**, A violation of Title 13 VSA 9 (b).

19. Christopher Moore (owner of the Volvo) was contacted by Deputy Haber and was asked if he can search the vehicle. Moore gave consent. During the search of the vehicle, guns, a suitcase of cloths, back pack of cloths, pants that looked like they have blood on them, knives, to include a hunting type knife (fixed blade) which has a brownish stain on the base of the blade. Also in the vehicle were numerous license plates from Vermont, New Hampshire, Colorado, Indiana, California and identification cards, as well as other miscellaneous items to include assorted keys and vehicle keys. There were 17 license plates in total.

20. Deputy Haber stated that Buswell and Lesage are being held in Indiana on charges and are also the persons of interest in a vehicle fire in Allen County, IN. The vehicle that was set on fire was the stolen vehicle from Vermont.

21. On September 18, 2020, myself and Officer Ben Gates went and spoke with Paige Demarse. I asked Demarse if she would be willing to do a photo lineup of females to try and identify who assaulted her and Owen. She agreed. I read her the instructions for the lineup. I showed Paige 8 pictures of females. When I showed her the first picture she that it is possible that she is the one. After reviewing all the photos, Paige positively identified the photo showing Lesage. This was recorded on Officer Gates Axon Body Camera.

22. Officer Gates and I then went to Taylor Bushey's residence. I asked Bushey if she would be willing to try and identify the female from the night of the incident. She said she was. I read her the instructions for the lineup. When I showed the first picture she identified her as the person from the night of the incident. I showed her the remaining 7 pictures and she did not pick anyone else. She positively Identified Lesage. This was recorded on Officer Gate's Axon Body Camera.

Subscribed and Sworn to before me on

This 22 day of September 20 20

_____
(Affiant)

_____
(Notary Public)

_____
(Date)

Mail - McCarty, Francis - Outlook



**Hughes, Jim**



| | |
|---|---|
| **From:** | Riddicklesage@outlook.com |
| **Sent:** | Thursday, February 11, 2021 4:29 PM |
| **To:** | Hughes, Jim |
| **Subject:** | In ReAlexis lesage |

**EXTERNAL SENDER: Do not open attachments or click on links unless you recognize and trust the sender.**
Hello, I am you ahave a hearing on a case tomorrow in regards of Alexis Lesage,, a relative of mine who we all have serious concerns about in the possibility that she may be released. Alexis has been some mental health issues that make her very unpredictable and dangerous. She is one minute away from she is fine and the next she attacks people. She has
Been writing letters trying to manipulators to make up a story about an alibi so she will get a switch we all refuse to do. We have all all explained to her that her best bet is to accept responsibility and move on from there. I told her that several months ago over the phone when she called and she became very upset and hostile & response was "fu was you will be the next one I stab` and she hung up on me. She has been glorifying her actions and has even told several of us that it was not the guy that stabbed him it was her so we can either do what she wants or else so now we have to worry about our own safety and there's several of us took feel this way and it is an unfortunate situation when you feel you have to reach out to the person that is Prosecuting one of your beloved family members but at this point we do not know what else to do because we want both her and us to be safe but don't think that will happen and she repeatedly has stated that she will seek revenge on DCF for taking her children as soon as she's able to and given the fact that she talked someone 2 opening fire with a gun on the foster parents of the children a few days prior to the incident in your county I'm sure you are already aware that. I would have liked to talk to you and mentioned this weeks in advance not on the eve of her court date but this was not an easy decision to make and I wrestled with it for a long time. But I think it all comes down to she may be able to get the help she needs while incarcerated and hopefully that staff will be able to keep her safe from herself and that will also help us feel a little safer and at the same time knowing that she will get the help she needs. I personally feel that your shoes released it will be a matter of days before somebody else gets seriously hurt or worse and none of us are willing to let her stay with us and she threatened her mother so much that she told me that she is afraid that she will kill her if she doesn't allow her to stay there like I said it is a unfortunate and very sad situation for everybody involved so I hope you were able to have her remain in custody and we thank you for your service
Sent via the Samsung Galaxy S8 Active, an AT&T 5G Evolution smartphone
Get Outlook for Android



### SOUTH BURLINGTON POLICE DEPARTMENT
### STATEMENT FORM

NAME: Cody Paquette

ADDRESS: 20 Tanglewood dr

S. burlington VT 05403

DOB: __/1995__ POB: _VT_    PHONE#'s: (home #) 802 825 (work #) _____ (cell #) _____
2143

CASE NUMBER 20SB008827

DATE: 9/11/20    TIME: 2322

OFFICER: DET. GREAUS

I, Cody Paquette _____, having been duly sworn by the Notary and under Oath, Freely and voluntarily give the following statement which is true and accurate to the best of my knowledge.

My girlfriend pulled in and I saw a gold ferd escort, which is my brothers ex girlfriends car. so I told her to pull up next to it. I said "who the fuck are you". My girlfriend backed up behind them as the were pulling down the driveway. The male stopped the car and got out and pointed a gun towards the car and fired it. They pulled off. Then my girlfriend was having a panic attack so I told her to get out and I pulled the car forward

<u>THIS IS A SWORN STATEMENT</u>

Subscribed and Sworn before me on this

_12_ Day of _September_, 20 _20_

_____
Notary Public

_____
Affiant

9/12/20
Date

Page 1 of 1

## SOUTH BURLINGTON POLICE DEPARTMENT
### STATEMENT FORM

NAME: Kristina Pretty

ADDRESS: 289 Julie dr unit 2

Colchester VT 05446

DOB: / /20  POB: VT  PHONE#'s: (home #) 802-363 (work #) _____ (cell #) _____
-8495

CASE NUMBER 2058008821

DATE: 9/11/20  TIME: 23??

OFFICER: Det. Grucus

I, Kristina Pretty, having been duly sworn by the Notary and under Oath, Freely and voluntarily give the following statement which is true and accurate to the best of my knowledge.

We (my boyfriend & I) saw Alexis and the male driver at Mcdonalds on Shelburne rd at 11:07pm on Sept 11, 2020. After we saw them I had my boyfriend (Cody) take pictures to send to his brother for him to know She's out late and not going to visits for no reason. After that we went to the gas Station to get lotto tickets to have a relaxing evening at home. When we pulled into the driveway Alexis was in the passenger seat and her boyfriend had backed the car down the driveway. When I realized I forgot something at the store, we backed out right behind Alexis and her bafriend pulling out. Cody saw them stop so I stopped on the breaks, I heard him yell but I don't remember what he said. Next thing I knew I was looking out the passenger side mirror and I was looking down the barrel of a gun. I heard the shot go off and had a whole panic attack

THIS IS A SWORN STATEMENT

Subscribed and Sworn before me on this

12 Day of SEPTEMBER, 2020

Notary Public

Affiant

9/12/2020
Date



# SUPPLEMENTAL AFFIDAVIT

**ST. ALBANS POLICE**

**STATE OF VERMONT
FRANKLIN COUNTY**

Now Comes **Det/Sgt. Francis J. McCarty**, Affiant, being duly sworn and on oath, deposes and says.

**CASE #20SA008494**

1. On September 12, 2020 I was called in to assist with an assault that occurred at the boat launch on Hathaway Point Road. The victim was already transported to Northwest Medical Center. I met Sgt. Michael Malinowski at the hospital. When I spoke with Malinowski he told me it was Jeremy Philips and showed me a picture of Philips. I asked him how he knew this. Malinowski said he showed Pelkey and Pelkey said that was the guy. I told Malinowski that Philips is in jail and it could not of been him.

**Subscribed and Sworn to before me on**

This 12 day of October 20 22

_____
(Notary Public)

_____
(Affiant)

10/12/2022
(Date)

IN THE VERMONT SUPERIOR COURT
FRANKLIN COUNTY CRIMINAL DIVISION


STATE OF VERMONT,                    ) Case No.   1126-9-20 Frcr
            Plaintiff,               )
                                     )
-against-                            )
                                     )
MALACHI A. BUSWELL,                  )
            Defendant.               )
_____ )


TRANSCRIPT OF FILE
"AXON_Body_2_Video_2020-09-13_0106"


LOCATION:           Northwestern Medical Center
                    133 Fairfield Street
                    St. Albans, Vermont 05478


DATE:               September 13, 2020

APPEARANCES:

OFC. KAYLIE CADORETTE
DET. SGT. FRANK MCCARTY

UNIDENTIFIED SPEAKERS

OWEN PELKEY

*[Handwritten notes:]* Older male. Page 13 and 14= Mr. Pelkey: 6 Feet - 6 Feet Plus with Neck and other Tattoos. Page 19= Mr. Pelkey: Identified Jeremy Philips as The man who attacked him. However, Philips was locked up.

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

(Video commenced at 1:06 AM)

OFC. KAYLIE CADORETTE:  Yeah, so okay.  So you guys get out there.

MR. OWEN PELKEY:  Yeah.

OFC. CADORETTE:  Were you getting out of the car?

MR. PELKEY:  I -- I was just -- we were just waiting, and then like, when he was coming, I was going to go with them to the, like, water, like, it literally when he -- I was getting out and he basically just [pbbt], [pbbt], [pbbt], did his thing.  I like, kicked him a few times again with my leg because I had two girls in the car and I didn't want them getting hurt.  Did Mr. Owen Pelkey get out? He indicated that

OFC. CADORETTE:  Yeah.

MR. PELKEY:  So I was like, I literally -- and I didn't want to get hurt, so I kicked him, and he got me a few times.  Like, these two times, and then I just kept pushing and pushing him away to get him away from us.  And that's when the other guy came up with the shotgun, aimed it at my head, and literally did this for a few seconds, and then they took off.  So, The oHs pvs Did him do the same!

OFC. CADORETTE:  Okay.  Were you still sitting in the car at that point?

MR. PELKEY:  Yeah, I never --

OFC. CADORETTE:  You hadn't had a chance to get out?

MR. PELKEY:  No.

"Axon-body-2-Video-2020-09-13-0106"    13

from St. Albans, possibly intoxicated driver, needs (indiscernible). And (indiscernible) in the vehicles --

AUTOMATED VOICE: I'm sorry. The person --

DISPATCH: -- heading southbound to the (indiscernible) on 89. Left about two minutes ago from St. Albans. That's going to be 4513534 on a New Hampshire plate. End of BOL. ?

MR. PELKEY: Try again.

AUTOMATED VOICE: I'm sorry --

MR. PELKEY: It's not perfect.

OFC. CADORETTE: Do you know where she lives?

MR. PELKEY: I have no clue. I literally knocked on the (indiscernible) what was it, the sports center complex? So no. We'd go out from there and this happens and now she's not answering me. Pick up. What's the name of this place again?

OFC. CADORETTE: Northwest Medical Center.

UNIDENTIFIED SPEAKER 2: Where is Ms. Cad?

OFC. CADORETTE: Right here.

UNIDENTIFIED SPEAKER 2: Hey buddy.

MR. PELKEY: How's it going?

UNIDENTIFIED SPEAKER 2: So neck tats. How tall is he?

MR. PELKEY: I want to say he was like six foot.

UNIDENTIFIED SPEAKER 2: Okay.

"Axon_body_2_Video_2020-09-13_0106"                    14

MR. PELKEY: ~~So maybe someone else might taller.~~

UNIDENTIFIED SPEAKER 2:  Did he have like a speech impediment, did you notice, or an accent?

MR. PELKEY:  He didn't even talk.  He literally just came up, pointed the shotgun at my head, and like held my neck.  While the other -- I don't know if it was a guy or girl.  It looked a guy, but my girlfriend was saying it looked like a girl.  But they took the key -- he did that while she took the key.

UNIDENTIFIED SPEAKER 2:  Was he wearing a shirt?

MR. PELKEY:  No.  He was just, you know, like how I am right now.

UNIDENTIFIED SPEAKER 2:  No shirt, huh?

MR. PELKEY:  No shirt.  Nothing like that.  Because the little one, I don't know if it was a guy or girl.  I think it was a guy, I'm pretty positive, but --

UNIDENTIFIED SPEAKER 2:  Yeah.

MR. PELKEY:  -- like I said, my girlfriend thinks it was a girl.  He opens that one open with (indiscernible) -- yeah, that guy.  That and his -- the girl --

OFC. CADORETTE:  Who is that?

MR. PELKEY:  -- called -- I think it was a girl actually because she said, babe, shoot him, babe, shoot him, when I was pushing her away.

UNIDENTIFIED SPEAKER 2:  So he had chest tats and

"Axon_body_2_Video_2020-09-13_0106"    15

Everything?

OFC. CADORETTE: Yes. That's what she said.

MR. PELKEY: I -- yeah.

OFC. CADORETTE: She said his neck and across his shoulders --

MR. PELKEY: Yeah. It was a silver Ford Escape. I don't know if it's --

UNIDENTIFIED SPEAKER 2: Okay.

MR. PELKEY: But yeah. Also, I was telling -- I don't -- what's your name again?

OFC. CADORETTE: Officer Cadorette.

MR. PELKEY: Cadorette.

UNIDENTIFIED SPEAKER 2: Yeah.

MR. PELKEY: That I'm pretty positive it's in the center console, but I don't want them getting a hold of my wallet because my wallet --

OFC. CADORETTE: Well, your car isn't there anymore. It's at the --

MR. PELKEY: Yeah.

OFC. CADORETTE: -- State Police barracks. So they won't get it.

MR. PELKEY: Yeah.

UNIDENTIFIED SPEAKER 2: So you were just smoking weed or something?

MR. PELKEY: What?

"Axon_body_2_Video_2020-09-13_0106"                    16

UNIDENTIFIED SPEAKER 2:  You guys were just going down there to smoke weed or something?

MR. PELKEY:  No, we were just literally like I said, I told them, like I want to go --

UNIDENTIFIED SPEAKER 2:  No just the reason I say that is just for up here, it's like normal reasons to -- I'm not -- with you, I don't think it's this at all.

MR. PELKEY:  Yeah.

UNIDENTIFIED SPEAKER 2:  But like these incidents are like heroin related and shit, so it's not usual --

MR. PELKEY:  Yeah.

UNIDENTIFIED SPEAKER 2:  -- to get something that's not --

MR. PELKEY:  Yeah, I -- he literally comes up, opens the door, and says, stop following me, bro. I don't -- I don't get why, like, I literally pulled in --

UNIDENTIFIED SPEAKER 2:  How did he say, bro?

MR. PELKEY:  What?

UNIDENTIFIED SPEAKER 2:  Did he say it with like, you didn't notice an accident or anything?

MR. PELKEY:  No, it was just regular --

UNIDENTIFIED SPEAKER 2:  Yeah.  Okay.

MR. PELKEY:  It wasn't --

OFC. CADORETTE:  It wasn't him that said it though. It was the other one.

Axon-body-2-Video-2020-09-13-0106

UNIDENTIFIED SPEAKER 2:  Oh, with the girl?  There was two dude --

MR. PELKEY:  It was the little one that my girlfriend thinks is a girl, I think is a guy.

UNIDENTIFIED SPEAKER 2:  Okay.

MR. PELKEY:  But you know, it probably was a girl considering she said babe to the guy in the -- they literally stopped, someone got out, and I'm like what the hell, and I tried going because they were like go, go for some reason and my girlfriend because I -- I was worried and mine's this manual, so it's hard to --

UNIDENTIFIED SPEAKER 2:  Yeah, yeah.

MR. PELKEY:  -- you know, get the clutch going and punch it.

UNIDENTIFIED SPEAKER 2:  Okay.

MR. PELKEY:  And yeah.

UNIDENTIFIED SPEAKER 2:  Okay.  So (indiscernible).

MR. PELKEY:  It's just two people.

UNIDENTIFIED SPEAKER 2:  Okay.  All right.

MR. PELKEY:  I can't believe someone would just do that.  Like, dude, I'm not calling the cops.  I don't even have my phone.  I normally, would that way, would have.

DISPATCH:  (Indiscernible).  10-4, do you want me to pop it back up into the end dispatch call for (indiscernible) car.

Axon_body_2_Video_2020-09-13_0106                    18

MR. PELKEY:  Trying to get my girlfriend to -- but she's not replying to me (indiscernible).

UNIDENTIFIED SPEAKER 2:  Which one?  They're both here?

MR. PELKEY:  The one that was in the passenger seat.

UNIDENTIFIED SPEAKER 2:  Okay.  (Indiscernible).

OFC. CADORETTE:  Are they back out there?  Okay, good.

UNIDENTIFIED SPEAKER 2:  Did you call your mom yet?

MR. PELKEY:  Yeah, I did.  They're on their way. They live in Hinesburg, so it'll be --

UNIDENTIFIED SPEAKER 2:  Be a little bit?

MR. PELKEY:  Yeah.

UNIDENTIFIED SPEAKER 2:  Okay.

DET. FRANK SGT. MCCARTY:  Hey.  What's going on, man?

MR. PELKEY:  Not much.  How are you?

DET. SGT. MCCARTY:  I'm doing all right.  I'm Frank.

MR. PELKEY:  Nice to meet you, Frank.

DET. SGT. MCCARTY:  Same here.  What happened, man?

MR. PELKEY:  So I was just chilling with my girlfriend and her friend.  We were -- I wanted to go walk by the water down there, and some dude literally came up and opened my door and just started stabbing me for no reason.  He said, stop following me, bro, and then when I was defending myself, because I don't want my girlfriend or her friend to

"Axon_body_2_2020-09-13_0106"    19

get hurt, I was pushing them away like kicking them away, and my car was (indiscernible) and I was trying to get it started and go, but man, you know, with the clutch it wasn't doing it. And so basically, she says, shoot him, shoot him, to the guy in the car, and what happens is I struggle and they're trying to take my keys. They got my keys, or one of my keys, so I don't -- I kind of want to get a new ignition for my car. But basically what happened was she said that and then the other, the guy, comes up, aims a like, antique, like, shotgun it looked like to me from the -- or might've been just a rusty barrel, at my head and he pushes me and chokes me and holds me against like the head rest of my seat, and then they take off and go as the -- where we were sitting in my car it was a right, but they went and he showed me a photo of what looks like the guy who did it to me, who pushed me against my seat.

DET. SGT. MCCARTY:  Okay.

MR. PELKEY:  So it was literally, I just wanted to go walk by the water because you know, a cool night, you know, see the water and everything.  Yeah, knowing that they were there, I probably shouldn't have, but you know.

DET. SGT. MCCARTY:  Did the car pull in?

MR. PELKEY:  No, they literally like -- we just literally sat for like a few minutes.  And they were parked like way in the back, like not even near us, and then they come up and I don't know why they would do something like

"Axon-body-2-Video-2020-09-13_0106"    20

that.  And he's like, stop following me, bro, and I'm like, I didn't even follow him.  There was no cars on the way down there when I was driving, and I don't know.

DET. SGT. MCCARTY:  Where are you from?

MR. PELKEY:  I'm from Hinesburg, so I'm about an hour or so --

DET. SGT. MCCARTY:  What were you doing up here in St. Albans?

MR. PELKEY:  My girlfriend lives up here.

DET. SGT. MCCARTY:  Who is your girlfriend?

MR. PELKEY:  Paige.  I forget what her last name is.  Demarse, I think.

DET. SGT. MCCARTY:  You forgot your girlfriend's last name?

MR. PELKEY:  It's like, she's outside right now.  It's -- I have it in my phone on her Snapchat.

UNIDENTIFIED SPEAKER 2:  How long have you guys been dating?

MR. PELKEY:  Just tonight.  So --

UNIDENTIFIED SPEAKER 2:  Oh.

DET. SGT. MCCARTY:  Yeah.

UNIDENTIFIED SPEAKER 2:  So is it like a hookup thing?

MR. PELKEY:  No, it wasn't a hookup thing.  It was like basically one night I was sad in my bed, and just add a

D                    1

IN THE VERMONT SUPERIOR COURT
FRANKLIN COUNTY CRIMINAL DIVISION


STATE OF VERMONT,                    ) Case No.   1126-9-20 Frcr
            Plaintiff,               )
                                     )
-against-                            )
                                     )
MALACHI A. BUSWELL,                  )
            Defendant.               )
_____    )


TRANSCRIPT OF FILE
"AXON_Body_2_Video_2020-09-13_0123"


LOCATION:            Northwestern Medical Center
                     133 Fairfield Street
                     St. Albans, Vermont 05478


DATE:                September 13, 2020

*Ms. Bushe: Testified she never saw the Male('s)*

APPEARANCES:

UNIDENTIFIED OFFICER

PAIGE DEMARSE
TAYLOR BUSHEY










PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

(Video commenced at 1:23 AM)

UNIDENTIFIED OFFICER: So he had neck tats, chest tats. What did the --

MS. PAIGE DEMARSE: And --

UNIDENTIFIED OFFICER: What did the tats look like?

MS. DEMARSE: Oh, God. I don't know. They were just --

UNIDENTIFIED SPEAKER: Do you want (indiscernible) quiet room --

UNIDENTIFIED OFFICER: For like (indiscernible), yeah, that'd be great.

UNIDENTIFIED SPEAKER: Yeah. That way you can have some privacy. I just (indiscernible). It's this room right here on the left.

MS. DEMARSE: Thank you.

UNIDENTIFIED OFFICER: So what did they look like, do you remember?

MS. DEMARSE: He had, I think like a mohawk type thing. It was like shaven, I think, (indiscernible). He was really skinny, really skinny. He was like five-seven, like around there, I think. He had tattoos, the entire sleeve, and then I think there was like a few right here, but it wasn't like completely full. And that's all I saw.

UNIDENTIFIED OFFICER: Okay.

MS. DEMARSE: I wasn't --

UNIDENTIFIED OFFICER: So was it like this?

MS. DEMARSE: Maybe.

UNIDENTIFIED OFFICER: Maybe?

MS. DEMARSE: It looks really familiar, yes. I think so, the tattoo placement.

UNIDENTIFIED OFFICER: Listen, it doesn't have to be him. I'm just trying --

MS. DEMARSE: Do you have a picture of the girl?

UNIDENTIFIED OFFICER: I don't. I don't know --

MS. DEMARSE: Because I made eye contact with her (indiscernible). But yes, that kind of looks like him.

UNIDENTIFIED OFFICER: What does -- okay.

Hey, can I talk to you? So can you describe his tattoos to me?

MS. TAYLOR BUSHEY: No, I don't see --

UNIDENTIFIED OFFICER: You didn't even see him?

MS. BUSHEY: No, I didn't see him.

UNIDENTIFIED OFFICER: Okay. That's fine. All right. That is fine. All right. Did you know, did you hear him talk?

MS. BUSHEY: No.

UNIDENTIFIED OFFICER: Okay.

MS. BUSHEY: I did not.

UNIDENTIFIED OFFICER: All right.

(Video concluded at 1:25 AM)

C E R T I F I C A T I O N

I, Gina Gattone, the court approved transcriber, do hereby certify the foregoing is a true and correct transcript from the official electronic sound recording of file "AXON_Body_2_Video_2020-09-13_0123", to the best of my knowledge and ability, in the matter of **STATE OF VERMONT V. MALACHI A. BUSWELL**, DOCKET NO. 1126-9-20 Frcr.

October 31, 2022

GINA GATTONE                    DATE

AAERT Certified Electronic Transcriber, CET-769

C

IN THE VERMONT SUPERIOR COURT
FRANKLIN COUNTY CRIMINAL DIVISION


STATE OF VERMONT,                    ) Case No.   1126-9-20 Frcr
            Plaintiff,               )
                                     )
-against-                            )
                                     )
MALACHI A. BUSWELL,                  )
            Defendant.               )
_____    )


TRANSCRIPT OF FILE
"AXON_Body_2_Video_2020-09-12_2359"


LOCATION:          St. Albans, Vermont


DATE:              September 12, 2020


APPEARANCES:

SGT. MICHAEL MALINOWSKI
OFC. KAYLIE CADORETTE
CPL. MICHAEL FULLER


UNIDENTIFIED OFFICERS
UNIDENTIFIED PARAMEDICS

OWEN PELKEY
PAIGE DEMARSE
TAYLOR BUSHEY


PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

(Video commenced at 11:59 PM)

MR. OWEN PELKEY: -- fucking young kid, and then looked like his father. It's got a hole. I forget where exactly.

CPL. MICHAEL FULLER: Where is the hole?

OFC. KAYLIE CADORETTE: Right there.

SGT. MICHAEL MALINOWSKI: Another one's up there.

CPL. FULLER: He's got two?

MR. PELKEY: It's very --

SGT. MALINOWSKI: Not very deep.

MR. PELKEY: No, it's like deep like this cut right here. Like, he stabbed me a few times. I don't --

SGT. MALINOWSKI: This isn't going to work for that.

CPL. FULLER: For this?

SGT. MALINOWSKI: Okay.

MR. PELKEY: And then there's another one like that deep right here like kind of near my heart.

SGT. MALINOWSKI: Okay. Do you have a -- I'll be right back.

CPL. FULLER: Yeah. Got a halo seal?

MR. PELKEY: I know you guys are doing your job, but I'm just freaked out right now.

SGT. MALINOWSKI: Do you need a chest (indiscernible). He's breathing fine.

CPL. FULLER: Right.

OFC. CADORETTE: What's your name?

MR. PELKEY: Owen Pelkey. I live in Hinesburg.

OFC. CADORETTE: Okay. And you don't know the person who did this?

MR. PELKEY: I have no clue. He literally came up, stabbed me. I tried fighting him off to get him off me, so that I wouldn't get hurt, stabbed multiple places, more than where I got. And he literally took off and hit -- some older man with -- it looked like a son and a father or an uncle or something, came up, and he choked me, and pointed a double barrel shotgun right at my head. Fullength Longer than my Arm? Most double Barrel Shotguns are

OFC. CADORETTE: The older male? 28" to 36" Barrels. Not including action and stock!

MR. PELKEY: Yeah, the older male.

MS. PAIGE DEMARSE: I got a pretty good look at --

OFC. CADORETTE: Were they all together?

MR. PELKEY: They --

MS. DEMARSE: So the girl climbed out of the car.

MR. PELKEY: I don't think it was a girl though.

MS. DEMARSE: No.

MR. PELKEY: I think it was a male.

MS. DEMARSE: I think that they were dating. I think it was like an older man with a younger woman.

Did the Mold(s)speaker Not? MR. PELKEY: "They" said stop -- stop following us.

CPL. FULLER: What's that?

OFC. CADORETTE: Can I get a (indiscernible) glove?

SGT. MALINOWSKI:  I don't have any.

CPL. FULLER:  I might.  Let me look.  No, I'm out too.  I'm out, unless you have some in my cruiser, but I don't think so.

MR. PELKEY:  Basically, (indiscernible) stop fucking following us, and I (indiscernible) whoever it was, it was a girl or a guy, (indiscernible) --

SGT. MALINOWSKI:  Yah.

MR. PELKEY:  And (indiscernible) --

SGT. MALINOWSKI:  -- out of the car?

MR. PELKEY:  (indiscernible).

MS. DEMARSE:  No, she --

(Indiscernible conversation)

MR. PELKEY:  They didn't take -- this is my car, yes.  Yes.

SGT. MALINOWSKI:  (Indiscernible).

CPL. FULLER:  Just that poke?

SGT. MALINOWSKI:  Yeah.  It's just a --

CPL. FULLER:  We can still go --

SGT. MALINOWSKI:  Do you have a (indiscernible).

CPL. FULLER:  We can go above his right shoulder and below his armpit.

SGT. MALINOWSKI:  It's not bleeding now.  It stopped bleeding.

MR. PELKEY:  I don't know about this.

SGT. MALINOWSKI: Do you have a combat gauze? This is just another one of those.

CPL. FULLER: I can check.

SGT. MALINOWSKI: Where are we getting it? Yeah, so --

CPL. FULLER: So the Escape's not stolen. It's just what they took off in.

MR. PELKEY: It's silver or grey. It's one of those two.

SGT. MALINOWSKI: It's an Escape, you said, right?

MR. PELKEY: Yeah, it's a Ford Escape.

UNIDENTIFIED OFFICER 1: SUV --

CPL. FULLER: SUV (indiscernible).

MR. PELKEY: They went that way.

SGT. MALINOWSKI: To the right? ←Dead End

MR. PELKEY: Yeah, they went to the right. I don't know which --

SGT. MALINOWSKI: Okay.

MR. PELKEY: -- where this road leads

UNIDENTIFIED OFFICER 1: We got two others coming.

CPL. FULLER: Do you need this?

SGT. MALINOWSKI: Not that. I want the gauze. Take a seat on the hood of your car, dude.

MR. PELKEY: Yeah, all right.

UNIDENTIFIED OFFICER 1: (Indiscernible) right there.

CPL. FULLER: Yeah.

UNIDENTIFIED OFFICER 1: Do you know if somebody else could see her that would go up?

CPL. FULLER: Okay.

UNIDENTIFIED OFFICER 1: (Indiscernible) you're not Mike.

CPL. FULLER: Well, I am Mike, just the wrong Mike.

UNIDENTIFIED OFFICER 1: (Indiscernible).

CPL. FULLER: Right. Yeah, he said the old man has a shotgun.

SGT. MALINOWSKI: Give me another one of those gauze if you have it.

CPL. FULLER: Okay.

UNIDENTIFIED OFFICER 1: Because it's all dead end from here.

SGT. MALINOWSKI: Yeah.

UNIDENTIFIED OFFICER 1: It's either Kill Kare or this dead end right here.

SGT. MALINOWSKI: Yeah, and there's a few other camps back in there, but you guys, you know them better than most folk do.

UNIDENTIFIED OFFICER 1: Anywhere in the (indiscernible).

SGT. MALINOWSKI: Yeah. (Indiscernible) follow him to the hospital.

CPL. FULLER:  Follow him to the hospital?

SGT. MALINOWSKI:  Cadorette, can you just have them get out of the car and interview them separately, okay?

OFC. CADORETTE:  Yeah.

MR. PELKEY:  If you need to, that's my phone for --

SGT. MALINOWSKI:  So I'm going to have you come up over here and sit by the front of my car, okay?  And you're going to stand over by the hood of that car, okay?  So interview them separately and then get statements on that. Just hang out, like right on the hood.

Well, why don't you interview her, since we're just going to be waiting until AmCare gets here.

MR. PELKEY:  Since this was involved in a crime, do you guys need it for --

SGT. MALINOWSKI:  I don't need it.  We're going to -- yeah, we're going to take it up, I think.  We're going to hold on to it.  Don't worry.  It's not going to (indiscernible).

MR. PELKEY:  Okay.  This is my (indiscernible).  I work at a Volvo dealer on Shelbourne Road, so --

SGT. MALINOWSKI:  Yeah.  You're okay with us photographing it and everything.

MR. PELKEY:  Yeah, I mean, there's -- I have some of my personal belongings on me (indiscernible).

CPL. FULLER:  You weren't stabbed in the car, though. You just got in it after you got stabbed?

MR. PELKEY:  No, no.  I was in the car and he opened the door and started stabbing me --

SGT. MALINOWSKI:  Stabbed you.  Okay.

MR. PELKEY:  -- for no reason.

SGT. MALINOWSKI:  Okay.  How big was the knife?

MR. PELKEY:  It was probably what I would say --

CPL. FULLER:  So what's your name?

MS. BUSHEY:  Taylor Bushey.

CPL. FULLER:  Taylor Bushey.  You were here for this when it happened, right?

MS. BUSHEY:  Yes.

CPL. FULLER:  B-U-S-H-E-Y?

MS. BUSHEY:  Yes.

CPL. FULLER:  What's your date of birth?

MS. BUSHEY:  4/10/02.

CPL. FULLER:  And a phone number for you?

MS. BUSHEY:  802-782-9215.

CPL. FULLER:  So what happened?

MS. BUSHEY:  So we were just driving around and we came here to where we were going to go out to the water, just something to do.  And but we decided not to.  We were about to start driving away and these people had already been like parked here, but they were way back there.  We didn't think anyone was even in the vehicle because their lights were off.  And then they pulled up right next to us without their lights

on or anything, and so we stopped because they stopped right by us. And then this girl got out (indiscernible) to the door and started screaming, "Stop following me", and then she started punching him. And --

CPL. FULLER: Did she open up his door?

MS. BUSHEY: Yes.

CPL. FULLER: And then he was trying to like get her off, and then she started screaming at whoever she was with. I think it was an older man, to get the gun. And she also had a knife and started like trying to stab him. And I was ducked down because I heard that there was a gun. And Paige was just trying to get him like off each other. And then they had stabbed him and got in the vehicle, took his keys, and drove away.

CPL. FULLER: Okay. So she stabbed him, the female was the one --

MS. BUSHEY: Yeah.

CPL. FULLER: -- who stabbed him? Okay.

MS. BUSHEY: I think the male also did too.

CPL. FULLER: So there were two separate (indiscernible) knife, or?

MS. BUSHEY: I think it was the same knife, they were just --

CPL. FULLER: (Indiscernible) to her?

MS. BUSHEY: I'm pretty sure. I didn't see any of

it. I was in the back ducked down.

CPL. FULLER: Ducked down. You could just hear --

MS. BUSHEY: Yeah.

CPL. FULLER: -- what was happening?

MS. BUSHEY: Um-hum.

CPL. FULLER: So did you hear anybody say anybody's name?

MS. BUSHEY: No.

CPL. FULLER: Like --

MS. BUSHEY: Not at all. Yeah, I had no idea who those people were.

CPL. FULLER: Okay. So how would you describe her? What did she look like?

MS. BUSHEY: She was young. Definitely a teenage girl. I'm pretty sure she had like red hair. I couldn't really see much because -- but I'm pretty sure her hair was red.

CPL. FULLER: Okay. Tall, short?

MS. BUSHEY: She was shorter.

CPL. FULLER: Heavyset?

MS. BUSHEY: No. She was skinnier.

CPL. FULLER: Skinny?

MS. BUSHEY: Um-hum.

CPL. FULLER: Long hair or short?

MS. BUSHEY: It was in a bun.

CPL. FULLER: In a bun?

MS. BUSHEY: So I couldn't tell, yeah. It was like back.

CPL. FULLER: Okay. And how about the other guy that was stabbing --

MS. BUSHEY: I did not see them at all. *Didn't say him? was there 2 Males?*

CPL. FULLER: You didn't see --

MS. BUSHEY: No.

CPL. FULLER: -- either one of them?

MS. BUSHEY: Huh-uh.

CPL. FULLER: You just saw the female.

MS. BUSHEY: Yeah...

CPL. FULLER: And what kind of car were they in?

MS. BUSHEY: I have -- he knows the car, but I don't. I couldn't make it out.

CPL. FULLER: Do you say it was --

MS. BUSHEY: Like an SUV type --

CPL. FULLER: SUV style?

MS. BUSHEY: It was a bigger -- yeah.

CPL. FULLER: Do you know what color it was?

MS. BUSHEY: I think tan. It looked tan, beige-ish.

CPL. FULLER: Okay. Did you see if it had Vermont plates on it or something else?

MS. BUSHEY: I was trying to look for the plates when I was calling 911, but it was too dark.

12

CPL. FULLER:  Okay.  You're the one that called 911.

MS. BUSHEY:  Um-hum.

CPL. FULLER:  Okay.  And the older guy got out with the gun?

MS. BUSHEY:  Yes.

CPL. FULLER:  So you saw that much.

MS. BUSHEY:  Oh, no.  I didn't.  I just heard -- she started yelling, get the gun, get the gun, and then Owen started yelling like, he has a gun, so --

CPL. FULLER:  Okay.  So what you saw was fairly limited.  It was mostly --

MS. BUSHEY:  Yeah.

CPL. FULLER:  -- just --

MS. BUSHEY:  Yeah.  As soon as I ducked down, I didn't see --

CPL. FULLER:  Okay.  And how did you end up with blood on your hands?

MS. BUSHEY:  I was holding his -- one of his stab wounds to just try and stop the bleeding.

CPL. FULLER:  Okay.  Hold on just a second.  What's that?  What's that?

SGT. MALINOWSKI:  We got to photograph the blood on the --

CPL. FULLER:  Yeah, I was just going to photograph her hands.

SGT. MALINOWSKI: Yeah.

CPL. FULLER: Just this hand that you have blood on?

MS. BUSHEY: Yeah.

CPL. FULLER: Okay. It was from pressing one of his wounds.

MS. BUSHEY: Um-hum.

SGT. MALINOWSKI: And then back up and get a photo of her whole body and all that.

CPL. FULLER: Okay. You don't need to get that far away. Okay.

SGT. MALINOWSKI: All right. (Indiscernible) here. (Indiscernible). Did she swear to her statement and all of that?

CPL. FULLER: Yeah, what she saw was really limited. Said she was ducked down in the backseat when she heard there was a gun, so.

SGT. MALINOWSKI: Okay. And everything you told is true under the pains and penalties of perjury?

MS. BUSHEY: Yes.

CPL. FULLER: Okay. Let's see what we're going to do to get you out of here. Just hang out and we'll see if we can get you out. If you're cold, let me know, and I can always put you in my car.

MS. BUSHEY: Thank you.

SGT. MALINOWSKI: Okay. So we'll give you a ride up

14

to the hospital. That officer is going with him, okay? So the two of you can ride together in the back of her car. Okay?

MS. BUSHEY: Okay.

SGT. MALINOWSKI: Now you've got to photograph her.

CPL. FULLER: 61.

DISPATCH: I have a 54 on 31. Do you want to give a call, so we can connect you guys?

SGT. MALINOWSKI: I got it.

CPL. FULLER: 10-4.

SGT. MALINOWSKI: Of course, I ran out the door without my phone.

CPL. FULLER: Oh, is that what you had?

SGT. MALINOWSKI: Yeah, that's why I hadn't called you. That's probably Mac. Oh, no. That's them calling you. Thanks.

Hey, it's Malinowski.

CPL. FULLER: 304.

DISPATCH: (Indiscernible).

CPL. FULLER: You say, Stones? 10-4. Thanks. That's helpful.

SGT. MALINOWSKI: -- start canvasing here. Cadorette's going to bring the girls --

CPL. FULLER: (Indiscernible).

OFC. CADORETTE: I don't know (indiscernible). I

don't think so though.

CPL. FULLER:  (Indiscernible) lock it for you.

OFC. CADORETTE:  Yeah.

DISPATCH:  (Indiscernible).  Can you add an Owen Pulkey, 1499 please.

CPL. FULLER:  I know it's not ideal, and I'm all out of Clorox wipes, but if you want to use this, you can.  At least they're wet.

MS. DEMARSE:  Did you need to take a picture of mine or no?

CPL. FULLER:  Did she take a picture of yours?

MS. DEMARSE:  No.

CPL. FULLER:  Okay.  I will.  It should be -- here, you can at least use these.

MS. BUSHEY:  I got it.

OFC. CADORETTE:  Does the other one have tattoos or anything that you saw?

SGT. MALINOWSKI:  Hey, can you call in and then patch me in?  I wonder if this is Robtoy (ph.).  (Indiscernible).  Can you run Robtoy.

CPL. FULLER:  Which Robtoy?

OFC. CADORETTE:  He's the one (indiscernible).

CPL. FULLER:  Oh, he lives right here.  He lives right here.

OFC. CADORETTE:  Yeah.  Yeah.

SGT. MALINOWSKI:  Yeah, yeah.

CPL. FULLER:  Literally right up the street.

OFC. CADORETTE:  He said that he has -- I've never met Brad, but she said he had like short brown hair maybe and that he was like five-nine-ish.

CPL. FULLER:  Brad could be the older dude with the gun.

SGT. MALINOWSKI:  Yeah.

OFC. CADORETTE:  That's who -- that's who I was just describing.

CPL. FULLER:  Oh.

OFC. CADORETTE:  Oh, there were only two of them.

CPL. FULLER:  Right.

OFC. CADORETTE:  By "older," they meant twenty-nine or thirty.

CPL. FULLER:  Oh.

OFC. CADORETTE:  Yeah.  He wasn't old.

CPL. FULLER:  Oh.  Did you take photographs of the girls' --

OFC. CADORETTE:  No.

CPL. FULLER:  -- bloody hands?

SGT. MALINOWSKI:  Yeah, once you're done with that --

CPL. FULLER:  I would need the phone.

SGT. MALINOWSKI:  Yeah.  Before you take them, so you're going to take the two of them and follow them up here

17

to the hospital.

OFC. CADORETTE:  I'm taking them to the hospital?

SGT. MALINOWSKI:  Yeah, take them to the hospital too.

OFC. CADORETTE:  Okay.

SGT. MALINOWSKI:  Just so that they're out of here. And --

OFC. CADORETTE:  Where are they right now?

SGT. MALINOWSKI:  Then follow him up -- they're standing by his car.

CPL. FULLER:  They're standing by my car.

OFC. CADORETTE:  Oh, okay.  I saw them walk over there for a minute.  That's why I was like, I don't know where they are.

CPL. FULLER:  Yeah.

OFC. CADORETTE:  Okay.  If you want to -- can you just stand here for a second?  I'll get pictures of their hands and stuff.

CPL. FULLER:  I took a picture of my girl's hands, just --

OFC. CADORETTE:  Did you take any photos of the car?

CPL. FULLER:  I didn't yet, no.

OFC. CADORETTE:  I'll grab those.

CPL. FULLER:  Okay.

MR. PELKEY:  The problem with my car is it's on

(indiscernible) where I can pull into gear and just stomp on the gas.

UNIDENTIFIED PARAMEDIC 1:  Oh, I got you.

MR. PELKEY:  So I got (indiscernible) trying to get away (indiscernible).

(Indiscernible conversation)

CPL. FULLER:  Did you get out of the car at any point?

MR. PELKEY:  No, I didn't.  I stayed right in the car, and I didn't know -- like, I look over and I'm like, who the hell is opening the door --

UNIDENTIFIED PARAMEDIC 2:  Keep that arm relaxed.

MR. PELKEY:  Yeah.  And literally, he just started stabbing, you know.

CPL. FULLER:  Is that dried blood, or is that a scuff mark on your knee?

MR. PELKEY:  I think that's just dried blood.

CPL. FULLER:  Okay.  And the older guy, how old did you say you thought he was?

MR. PELKEY:  Probably your age, maybe a little bit older.

CPL. FULLER:  That's not very old, man.  I'm only twenty-seven.

MR. PELKEY:  Oh, really?  Maybe he was like thirty-five then.

CPL. FULLER:  Thirty-five?  Mid-thirties?

MR. PELKEY:  Mid-thirties, maybe early forties, something like that.

CPL. FULLER:  Oh.

UNIDENTIFIED PARAMEDIC 1:  (Indiscernible) heart rate?

UNIDENTIFIED PARAMEDIC 2:  Relax this arm.

CPL. FULLER:  Yeah, by "older", he was like, probably like mid-thirties.  I was like, okay.

OFC. CADORETTE:  Yeah, they said he was like an old guy --

CPL. FULLER:  That's not Brad Robtoy.

OFC. CADORETTE:  -- at first.

CPL. FULLER:  Yeah.  Yeah, that's what she said, there's an old guy with a shotgun.  I was like, okay.  Not mid-thirties.

OFC. CADORETTE:  And she said like, maybe like twenty-eight.

CPL. FULLER:  Yeah.

OFC. CADORETTE:  I don't -- I've never met Brad.  I don't know -- so I don't know how old he is.

CPL. FULLER:  Brad's old.

OFC. CADORETTE:  He is?

CPL. FULLER:  He looks like an old -- well, I mean, he's sixty.

OFC. CADORETTE:  Oh, really?

CPL. FULLER:  Yeah.  (Indiscernible) say.  Something like that.

SGT. MALINOWSKI:  I just got Frank coming in (indiscernible).

CPL. FULLER:  Those work out all right?

MS. DEMARSE:  Yeah, they work pretty good.

CPL. FULLER:  Are you guys all set with them?

MS. DEMARSE:  Yeah.  Thank you.

CPL. FULLER:  You guys weren't following anybody, though.  Were you?

MS. DEMARSE:  No.

MS. BUSHEY:  No, we had no --

MS. DEMARSE:  That's why I don't get -- we were just -- we came in and parked here.

MS. BUSHEY:  They were here.

MS. DEMARSE:  They were already here.

MS. BUSHEY:  They were here.  Lights off.  Didn't look like anyone was even in there.

MS. DEMARSE:  Yeah.

(Indiscernible conversation)

SGT. MALINOWSKI:  (Indiscernible) younger kid (indiscernible) stabbed him in the chest and stabbed him in the arm.  Take off (indiscernible), was it a Ford Focus?

OFC. CADORETTE:  No, a Ford Escape.

21

SGT. MALINOWSKI:  Ford Escape.

OFC. CADORETTE:  (Indiscernible) type.  That's when (indiscernible).

CPL. FULLER:  Should be two males and a female.

OFC. CADORETTE:  (Indiscernible).

CPL. FULLER:  They said there was a younger girl.

OFC. CADORETTE:  She -- the second girl like only saw two people.

CPL. FULLER:  (Indiscernible) did you interview --

OFC. CADORETTE:  Yeah.

(Indiscernible conversation)

OFC. CADORETTE:  So the one that stabbed (indiscernible) was the -- like (indiscernible) wearing a (indiscernible) sweater and brown hair (indiscernible).  And then (indiscernible) the tattoos.

SGT. MALINOWSKI:  She said he was tatt'ed?

OFC. CADORETTE:  Yeah.  Tattoos on his neck.

(Indiscernible conversation)

UNIDENTIFIED OFFICER 2:  So they stole his car?

SGT. MALINOWSKI:  Stole his keys to his car.

OFC. CADORETTE:  No, they didn't steal the car.  Because he has an ignition key and a key for the door.  They stole one of the two of those.  I think it was the ignition key that they stole.

SGT. MALINOWSKI:  Yeah.

OFC. CADORETTE:  (Indiscernible).

SGT. MALINOWSKI:  Yeah.

OFC. CADORETTE:  They said the woman pulled in. Because he was parked in the back (indiscernible).  And that they pulled up next to them (indiscernible) and then the female got out and came and stabbed him, and then she was trying to reach over to get the key out of the car -- and then the kid fought her off, and then the male came and stuck a shotgun in his face or something, and (indiscernible) how she said they left after that and went that way.

CPL. FULLER:  Who interviewed him?  Did you interview him?

SGT. MALINOWSKI:  Yeah, briefly.  (Indiscernible).

UNIDENTIFIED OFFICER 2:  You got --

SGT. MALINOWSKI:  I got Frank coming. (Indiscernible).

(Indiscernible conversation)

SGT. MALINOWSKI:  He's going to hang with the car. She's going to bring them up to the hospital.  We're just going to (indiscernible).  (Indiscernible).

OFC. CADORETTE:  (Indiscernible) find it?

SGT. MALINOWSKI:  No, (indiscernible).

OFC. CADORETTE:  So female is my height, dark hair, wearing a dark sweater, and the male is about five-nine or five-ten with neck tattoos and dark hair.

SGT. MALINOWSKI: Hey, get in this car.

OFC. CADORETTE: I forgot my people.

CPL. FULLER: Almost.

OFC. CADORETTE: Oh, that sucks.

CPL. FULLER: What?

OFC. CADORETTE: Yeah, you can sit on this side. Is it dry?

CPL. FULLER: It should be.

SGT. MALINOWSKI: (Indiscernible) going to follow the wrecker.

(Video concluded at 12:24 AM)

C E R T I F I C A T I O N

I, Gina Gattone, the court approved transcriber, do hereby certify the foregoing is a true and correct transcript from the official electronic sound recording of file "AXON_Body_2_Video_2020-09-12_2359", to the best of my knowledge and ability, in the matter of **STATE OF VERMONT V. MALACHI A. BUSWELL**, DOCKET NO. 1126-9-20 Frcr.

October 20, 2022

GINA GATTONE                    DATE

AAERT Certified Electronic Transcriber, CET-769

**Exhibit F**

**Fri Jan 29 09:25:24 2021**         1

Vermont Superior Court                                    Franklin Criminal Division

---

Docket No.  1126-9-20 Frcr    State vs. Buswell, Malachi A. 1126-9-20 Frcr

---

Prosecutor:    James A. Hughes         Defendant:   Malachi A. Buswell
                                       DOB:             /1984
Motions pdg:                           POB:
Bail set:      $100000.00              Atty:
Incarcerated:
               Conditions:             Aliases:
Case Status:                           Address:
     Inactive - Arrest Warrant                      Burlington VT 05408
Next Hearing:

================================================================================
Dspt  Docket No.       Ct. Statute            F/M/O
================================================================================
1     1126-9-20 Frcr  1   13 2301              fel
      MURDER-2ND DEG/ATTEMPT
2     1126-9-20 Frcr  2   13 1023(a)(3)        mis
      ASSAULT-SIMPLE-ATTEMPTED BY MENACE
================================================================================

09/22/20   Information and Affidavit filed on 2 disputes.
           Dispute 1 for Docket No. 1126-9-20 Frcr Count 1, MURDER-2ND
           DEG/ATTEMPT, Felony, 13 V.S.A. 2301. Alleged offense date: 09/12/20.
           Arrest/citation date: 09/12/20 St. Albans PD.
           Dispute 2 for Docket No. 1126-9-20 Frcr Count 2,
           ASSAULT-SIMPLE-ATTEMPTED BY MENACE, Misdemeanor, 13 V.S.A.
           1023(a)(3). Alleged offense date: 09/12/20. Arrest/citation date:
           09/12/20 St. Albans PD.  Kelly Woodward, Victim's Advocate, entered
           as party/participant 3.
           Motion Application for Arrest Warrant filed by Attorney James A.
           Hughes for Plaintiff State on disputes 1-2. Motion Application for
           Arrest Warrant given to judge.
           Motion Application for Arrest Warrant given to Judge H. E.
           VanBenthuysen.
09/23/20   Motion 1 (Application for Arrest Warrant) granted by H. E.
           VanBenthuysen.
           Arrest warrant ordered on disputes 1-2 by H. E. VanBenthuysen per
           application of prosecutor.  $100000.00 bail set.
           Arrest warrant issued by Judge H. E. VanBenthuysen, Warrant No. 12865
           assigned.
           Case status changed to Inactive - Arrest Warrant.
           Probable Cause found by Judge H. E. VanBenthuysen on disputes 1-2.

Franklin Unit

## Case Summary

⌒ **Case No. 1126-9-20 Frcr**

| | | |
|---|---|---|
| **State vs. Buswell, Malachi A.** | §<br>§ | Location: **Franklin Unit**<br>Filed on: **09/22/2020** |

---

### Case Information

---

| Offense | Statute | Degree | Offense Date | Filed Date | Case Type: Felony |
|---|---|---|---|---|---|
| | | | | | Case Status: **01/30/2025 Disposed** |
| 1.  MURDER-2ND DEG/ATTEMPT | 13 VSA 2301 | FEL | 09/12/2020 | 09/22/2020 | |

    Arrest
        Date:  09/12/2020
        Control #:  20sa008494
        Agency:  0612 - St. Albans PD

    Offense Reports
        Agency:  St. Albans PD
            142 South Main Street
            Saint Albans, VT, 05478

| | | | | | |
|---|---|---|---|---|---|
| 2.  ASSAULT - AGGRAVATED WITH DEADLY WEAPON | 13 VSA 1024(a)(5) | FEL | 09/12/2020 | 09/22/2020 | |

    Arrest
        Date:  09/12/2020
        Control #:  20sa008494
        Agency:  0612 - St. Albans PD

    Offense Reports
        Agency:  St. Albans PD
            142 South Main Street
            Saint Albans, VT, 05478

    *Filed As:* ASSAULT-SIMPLE-ATTEMPTED BY MENACE
    *Original Statute:* 13 VSA 1023(a)(3)
    *Original Degree:* MIS
    *Amended Date:* 11/15/2024

### Related Cases
⌒  24-CM-00356 (Related Criminal Case)

### Statistical Closures
01/30/2025  Jury Trial

### Warrants
Application of Prosecutor - Buswell, Malachi A (Judicial Officer: VanBenthuysen, Howard E.)

| | | |
|---|---|---|
| 08/04/2022 | 12:00 PM | Withdrawn |
| 09/23/2020 | 01:21 PM | Pending |
| 09/23/2020 | 01:21 PM | Issued |

Fine:                        $0.00
Bond Set:                    $100,000.00                        Any

---

### Party Information

---

| | | |
|---|---|---|
| **Plaintiff** | **State of Vermont** | **Kranichfeld, Bram**<br>*Retained*<br>802-524-7920(W)    ·<br>bkranichfeld@gmail.com |
| | | **Watts, Andrew D**<br>*Retained* |

Printed on 07/02/2025 at 5:13 PM

**Exhibit D**

VERMONT SUPERIOR COURT

Franklin Unit
36 Lake Street
St Albans, VT 05478
802-524-7997
www.vermontjudiciary.org



CRIMINAL DIVISION

Case No. 1126-9-20 Frcr

| State vs. Buswell, Malachi A. | DOB: /1984 |
|---|---|

## Mittimus to Commissioner of Corrections

Re: Malachi A Buswell
Date of Order: ; 01/30/2025
Pros: Sarah A. Baker; Andrew D Watts; Bram Kranichfeld
Atty: Malachi A Buswell

### TO ANY LAW ENFORCEMENT OFFICER OF THE STATE OF VERMONT

You are ordered to commit the above-named defendant to the Commissioner of Corrections or an authorized representative who is ordered to receive the defendant in accordance with the following sentence(s):

| Sentence: |
|---|
| ; Confinement |
|         Confinement by Count |
|                 Count: 2. ASSAULT - AGGRAVATED WITH DEADLY WEAPON 13 VSA 1024(a)(5) |
|                         Forthwith |
|                         Minimum Term: 4 Years, 40 Days |
|                         Maximum Term: 4 Years, 340 Days |
|                         Consecutive With: With any other existing sentence and the sentence in the Contempt Case in 24-CM-00356. |
|                 Credit for Time Served |
|                 Credit Details: As allowed by law |

You must appear at the above facility at the date and time specified to serve your sentence. When you appear you must be drug and alcohol free. You must also provide a photo ID

By Order of the Court

Alison Sheppard Arms
Superior Court Judge

OFFICER'S RETURN
By Authority of this mittimus, I committed the above named defendant to the

_____    _____    _____AM/PM
Location/Corr. Facility                        Date            Time
and left the Supervising Officer of the facility a copy of this Mittimus with my return.

_____    _____
Officer's Signature                          Title

FILED: 1/31/2025 2:52 PM
Vermont Superior Court
Franklin Unit
1126-9-20 Frcr

**Exhibit E**          **VERMONT DEPARTMENT OF CORRECTIONS**
                       **SENTENCE CALCULATION NOTIFICATION**

TO:       Vermont Superior Court Franklin Criminal Division

FROM:     Vermont Department of Corrections at Northwest State Correctional Facility

RE:       State v. Buswell, Malachi       DOB:    /84     DATE: 1/31/25

          Docket #(s) 1126-9-20 Frcr

SENTENCING JUDGE:   Honorable Judge Alison Sheppard Arms

NOTIFICATION TYPE: New Mittimus ☒ Amended Mittimus ☐ Corrected Notification ☐

## Prior effective sentence information:

Minimum Sentence: n/a                       Credit applied to minimum:
Maximum Sentence:                           Credit applied to maximum:

Minimum release date:                       Maximum release date:
                                            Work Crew Days to Serve

## New effective sentence information

Minimum Sentence: 4y40d                     Credit applied to minimum: 798d
Maximum Sentence: 4y340d                    Credit applied to maximum: 798d

Minimum release date: **April 15, 2027**    Maximum release date: **February 9, 2028**
                                            Current balance of Work Crew Days
                                            Owed as of today

Pursuant to 13 V.S.A. Section 7044 the Department of Corrections will provide the Court with a current sentence computation based on the newly imposed sentence.

**Incarceration Type:**
Correctional Facility ☒ Work Crew ☐ Furlough ☐ Home Confinement ☐ Supervised Community Sentence ☐

Split with probation ☐ Sentence:          Interrupted ☐ Sentence:

Court Ordered Credit for time served      DOC Researched Credit 798 days

Comments: Release dates factor in remaining 6 months imposed in CS docket 24-CM-00356

Prepared by: Kimberlee Bevins, Corrections Sentence Computation Supervisor  Telephone: 802-798-2481

Distribution:   1) Sentencing Court 2) State's Attorney 3) Defense Attorney 4) Prisoner Rights for Defender General 5) Inmate 6) OMS Offender Record

SNF form 01/27/2022

**EXHIBIT B**

| STATE OF INDIANA | ) | | |
| --- | --- | --- | --- |
| | ) | SS: | IN THE DEKALB SUPERIOR COURT II |
| COUNTY OF DEKALB | ) | | |

| STATE OF INDIANA | ) | |
| --- | --- | --- |
| | ) | |
| VS. | ) | 17D02-2009-F4-000008 |
| | ) | |
| MALACHI A. BUSWELL | ) | |

*FILED*

AUG 01 2022

Clerk DeKalb Superior Court II

# ORDER AND JUDGMENT OF FELONY CONVICTION

## AND SENTENCING

On July 11, 2022, the State of Indiana appeared by DeKalb County Chief Deputy Prosecuting Attorney, Neal R. Blythe. The DeKalb County Probation Department appeared by DeKalb County Probation Officer, Mark Pomeroy. The Defendant, Malachi A. Buswell, appeared in person, in custody of the DeKalb County Sheriff's Department, and by counsel, Kevin L. Likes.

Felony Guilty Plea and Sentencing Hearing was held. The Court received evidence and argument.

Based upon the record of proceedings the Court **FINDS, ORDERS, ADJUDGES and DECREES:**

1    The Defendant is an adult male 38 years of age, his date of birth is February 23, 1984, and his Social Security Number is XXX-XX-1415

I

2.    On July 11, 2022, a written plea agreement was filed with the Court jointly by the parties.

3.    The Defendant has been advised of his constitutional rights, of the effect of a plea of guilty and the effect of a plea of not guilty, of the statutes under which he is charged, of the material elements the State of Indiana must prove in order to obtain a conviction, and of the possible penalties.

4.    The Defendant has pled guilty in open Court to the criminal offenses of Count II, Theft, a Level 6 Felony.

5.    The Court has found that his plea of guilty is freely, knowingly, and voluntarily made and that there does exist a factual basis for his plea of guilty establishing that he actually committed this offense, and he is now adjudged convicted of that criminal offense.

6.    The parties in this case have waived the preparation and filing of a Pre-Sentence Investigation Report and they have agreed and requested that the Defendant be sentenced on the same day of his guilty plea and the Court has accordingly waived the preparation and filing of a Pre-Sentence Investigation Report and sentences the Defendant on the same day of his guilty plea.

7.    For the conviction of the criminal offense of Count II, Theft, a Level 6 Felony, the Court sentences Defendant to 1324 days of incarceration at the Indiana Department of Corrections or the DeKalb County Jail, all years to be served as an executed sentence none suspended.

2

8. The Defendant is given 662 (actual days through and including July 11, 2022) accrued time awaiting disposition of this case. With the actual time served, Defendant has completed the executed portion of the sentence herein. The information regarding the Defendant's credit time for time spent in jail was related to the Defendant in open Court at the time sentence was imposed.

9. The Court does not order a fine.

10. The Court costs are found uncollectible.

11. That on motion of the State of Indiana by the DeKalb County Prosecuting Attorney's office, Count I is ordered dismissed.

12. That a Termination of the No-Contact Order entered herein is simultaneously issued.

All of which is **ORDERED** this 1st day of August, 2022.

Monte L. Brown
Judge, DeKalb Superior Court II

cc:   DeKalb County Prosecuting Attorney's Office
      DeKalb County Public Defender's Office
      DeKalb County Sheriff's Department

3

Franklin Unit

**EXHIBIT A**

## Case Summary

### ⌒ Case No. 24-CM-00356

| | | |
|---|---|---|
| **State of Vermont v. Malachi Buswell** | §<br>§ | Location: **Franklin Unit**<br>Filed on: **11/14/2024** |

---

## Case Information

---

| **Offense** | **Statute** | **Degree** | **Offense Date** | **Filed Date** | |
|---|---|---|---|---|---|
| 1. CONTEMPT | 12 VSA 122 | MIS | 11/14/2024 | 11/14/2024 | Case Type: Civil Miscellaneous<br>Subtype: Contempt<br>Case Status: **11/15/2024 Disposed** |

### Related Cases
⌒ 1126-9-20 Frcr (Related Criminal Case)

### Statistical Closures
11/15/2024 Non Trial Disposition

---

## Party Information

---

**Defendant Buswell, Malachi A**
White
Male
DOB: ᷎ '1984
DL: VT 42030201

**Plaintiff State of Vermont**

---

## Case Events

---

11/15/2024 📧
Order of Contempt    (Judicial Officer: Arms, Alison)
Prty in Cont: Defendant Buswell, Malachi A

11/15/2024 Case Closed

---

## Dispositions

---

11/15/2024 **Plea** (Judicial Officer: Arms, Alison)
Buswell, Malachi A
1. CONTEMPT
Guilty

11/15/2024 **Disposition** (Judicial Officer: Arms, Alison)
1. CONTEMPT
Guilty

11/15/2024 **Confinement Sentence** (Judicial Officer: Arms, Alison)
1. CONTEMPT
11/14/2024 (MIS) 12 VSA 122 (114)

Confinement
Confinement by Count
Count: 1. CONTEMPT 12 VSA 122
Forthwith

## Franklin Unit

## Case Summary

### Case No. 24-CM-00356

Minimum Term: 6 Months
Maximum Term: 6 Months
Consecutive With: Any sentence eventually imposed in 1126-9-20 Frer's conviction, or any other sentence in any other case.

---

## Other Documents

---

| | 11/15/2024 | Criminal Document | Criminal - Jail Mittimus | 2 Pages |
|---|---|---|---|---|

Printed on 07/02/2025 at 4:47 PM

## CaseLaw to Review

* Public Defender. Cf. State v. Bailey, 131 Vt. 366, 306 A.2d 672 (1973);

* Brady v. Maryland (Brady Rule);

* United States v. Walker, 965 F.3d 180;

* Cox v. Donnelly, 387 F.3d 193;

* Crawford v. Washington, 541 U.S. 36;

* Smith v. Cain, U.S. Sup. Ct. 2012;

* State v. Waterman, 2022 VT 1 (Bail/Bond);

* Green v. United States, 355 U.S. 84;

* State v. Pepio, 2024 U.S. App. LEXIS 30326;

* State v. Duff, 151 VT;

* State v. Crawford, 2018 VT;

* State v. Rogean, 2019;

* State v. Marriam, 192 Vt. 652 (States Unreasonable Standing for "Bail/Bond");

* State v. Brillon, 556 U.S. (2009);

* State v. Recor, 150 Vt. 40, 549 A.2d 1382, 1988 LEXIS 132 (2002) = (4-Point test to determin a Speedy Trial Violation);

* United States v. Campbell, 2022 U.S. App. LEXIS 1930 (First Step Act (2018), Amends 18USCS§942(c));

* Price v. Georgia, 398 U.S. 323;

* State v. Bean, 2016 VT 73;

* State v. Carter, 2017 VT 32;

* United STates v. Taylor, 816 F.3d 12;

* State v. Pitts, 174 Vt. 21, 800 A.2d 481, 2002 Vt. LEXIS 132 (2002);

* Xiulu Ruan v. United States, Sup. Ct. 2022;

* Gilles v. Repicky, 511 F.3d 239, 2007 U.S. App. LEXIS 29520;

* Pehush v. Ashworth, 757 Fed. Appx. 47, 2018 U.S. App. LEXIS 34046;

* Beck v. Ohio, 379 U.S. 89;

### Vermont Rules of Crim./Civ. Procedures

* V.R.Cr.P. Rule 44.2; V.R.Civ.P Rule 79.1 (Representantion and Dismissal of Attorney or Pro-Se Litigants);

### Vermont Constitution and United States Constitution

* Vt. Const. Ch. 1, Art. 10; United States Const. Amend. 6 ( Self-Represetation);

< V.R.Civ.P. Rule 80.4 (Habeas Corpus)
  Vt. Constitution Chapter 2§41 [Habeas Corpus]

• Statutes, Admin. Material, Directives, Constitutions •

• 28VSA§1(b): Imposes a "Mandatory Duty" on DOC. This does not give DOC discretion to refuse or otherwise neglect to develop and implement, and Provide, some Treatment or Programming for each offender, less those sentenced to "Life without Parole".

• CVR 13-130-020: Inmates (I/I's) shall be afforded the opportunity to participate in treatment or programming while they have Criminal Convictions under appeal. Treatment, Assessment, Eval, Screening, and Programming Shall Not be restricted or denied to inmates on the basis of any anticipated or pending Direct Appeal or Collateral Appeal of any Criminal Conviction, nor on the basis of any position taken by them in any such Action.
  — 28VSA§903; DOC Policy (Directive) #254 and #255—

• 3VSA§3052 (Mandatory Duties): Provides that the Commissioner of Vt. D.O.C. Shall uphold all Statutes and Constitutional Rights of I/I's under the Care and Custody of the State Entity they Run. That they must inforce these same Statutes and Constitutional Rights are upheld by their Staff/Employees Deputized or Contracted, as well as in standings of which affect such Staff.

• Town of Victory v. State, 174 Vt. 539 (2002) (Mem.): Using the word "Shall" in a Statute generally makes it a "Mandatory Duty".
  — P. ... 1 - f 4 —

- In reviewing a jurisdictional Motion (or Petition), "all uncontroverted factual allegations of the Complaint [are] accepted as True and construed in the light most favorable to the nonmoving party." (See: Mullinnex v. Menard, 2020 VT 33, 8, 212 Vt. 432, 236 A.3d 171 (2020) (Quoting: Condly v. Crisafuili, 2010 VT 38, 3, 188 Vt. 11, 13, 999 A.2d 677.))

- "To succeed, the Department must demonstrate "beyond doubt" that there exist no fact or circumstance that would entitle the Plaintiff to relief." (See: Wool v. Off. Pro. Regul., 2020 VT 44, 8, 212 Vt. 305, 310, 236 A.3d 1250 (Internal Quotations Omitted)).

- Vt. D.O.C. Dicertive #374= (R.I.S.) Risk Intervention Services Program - Authorized by: 28 VSA §§1, 101, 120, and 721 - 726.

- Vt. D.O.C Directive #371.10 = Risk Containment Policy - Authorized by: 28 VSA §§1, 101, 701, and 721

- United States v. Sullivan, 118 F.4Th 170: Abuse of Professional Discretion/Duty in regards to Monitary Funding provided for uses other than what the funds are spent on or wasted. (A.K.A. Fraudulent Acts)

- 28 VSA §107: Statute which provides I/I's required Documents.

- Iman v. Pallito, 2013 VT 94, 15, 195 Vt. 218, 224, 87 A.3d 499: Proves Case Law has made clear, that an extreme abuse of discretion still must amount "to a practical refusal to perform a certain and clear Legal Duty".

- In re Blow, 2013 VT 75: One finds that the Courts ruled, the Petitioner's inability to complete a rehabilitative program by the expiration of his minimum sentence, which was restored following his successful challenge to the application of 28 VSA §204b, was not in and of itself an Ex Post Facto Clause Violation. It was at most a collateral consequence of a constellation of factors.

- Charges and Convictions
  1) Franklin Unit, Criminal Division, Docket No.: 1126-9-20 Frcr.; I was Found Guilty of 13 VSA 1024 (a5), (subsection CC) and sentenced to Agg. Assault, 4y 1m - 4y 3m. DOC Cohersed the Court to change this to accommidate the addition of the R.I.S. Program which is Highly Illegal.
  2) Chittenden Unit, Criminal Division, Docket No.: 20-CR-03567; was Dismissed. Therefore, I was NOT convicted of this. No Programming.
  3) Chittenden Unit, Criminal Division, Docket No.: 20-CR-01502; is a misdomenor 13 VSA §1025, Sentenced to 1 y, Not a Programable Offense.

- Facts on Charges/Convictions per Affidavits.
  1) All 3 victims pointed their finger at Jeremyah Phillps as the perpetrator. Name Provided. (I was Guilty by Association, not Action)
  2) The State Dismissed This, Never Convicted.
  3) Victims stated my Co-Def. and her BF, now Husband committed Action. Not me.

- I was required to sign a Referral for Risk Intervention Services (R.I.S.) on 07/28/2025. I signed it with John Hardy (My Caseworker in NSCF) on 07/28/2025. This is a Binding Contract between myself and VtD.O.C. which binds Both Parties.

- I filled out and signed my first (1) VTDOC R.I.S. Program Accountability Statement on 07/28/2025. Mr. John Hardy Signed and dated it on 07/30/2025 (2 pages total).

- I filled out and signed my Second (2) VTDOC R.I.S. Program Accountability Statement on 08/21/2025. Mr. John Hardy Signed and dated it on 08/27/2025 (6 pages total).

- I met with Jill Raymond in her office in the B-Building at N.S.C.F. (Newport) on 09/02/2025, when she Denied me the R.I.S. Program. Due to open Civil Actions

- I was required to get into the MAT Program (Take Suboxone/Subutex) in order to take part in the R.I.S. Program. I do have the WellPath Med slips and I put in an I/I Records Request for the MAT Providers Records regarding this. I am now detoxing because I did not want to be on MAT Meds, I was "Forced" to get on them to comply with DOC's requirement for R.I.S.!

- I have Grieved these issues to no Avail. (In full Grievance's #1, #2, and #3) All of which are Dated and signed appropriately.

State of Vermont
Department of Corrections
Northern State Correctional Facility

## Incarcerated Individual Request Form

To: _CSS: Hardy or LUS: Lefabure_
(Name and Title of Staff Member)

Date: _10/15/2025_

SUBJECT:  (State Briefly, but completely, the problem on which you desire assistance.)

_I am respectfully requesting an up to date Sentence Comp. with my Good Time pursuant to 28 USA38II._

_Please and Thank you,_

_I also need a 6 month Statement for the last 6 months of my I/I Financial Account for Court. I sent a request to Mrs. Tardiff, can you please check on this?_

ACTION REQUESTED:  (State exactly how you believe your request may be handled, what you think Should be done.)

_See Above Please, Thank you._

_Malachi A. Buswell_              _CA #22_            _Malachi A. Buswell_
(Print Name Here)              (Living Unit)          (Signature of Requester)

DISPOSITION:  (Staff Response.)

_ATTACKED_

(Signature of Staff)                                      _10/22/2025_ (Date)

## Sentence Information - Notice of Earned Time Credit Award
### BUSWELL, MALACHI A  Jacket#: 80350

| Description | Sentence Date | Serve Type | Minimum Sentence | | | | | | | Type Affected | Maximum Sentence | | | | | | | Comments | Last Updated By | Last Updated Time |
| | | | Days Credit | Start Date | End Date | Yrs | Mths | Days | Hrs | | Days Credit | Start Date | End Date | Yrs | Mths | Days | Hrs | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1126-09-20 Frcr ASSAULT - AGG WITH DEADLY WEAPON | 01/30/2025 | Concurrent | 858 | 01/30/2025 | 12/18/2026 | 4 | 0 | 40 | 0 | | 858 | 01/30/2025 | 10/14/2027 | 4 | 0 | 340 | 0 | 858d/ct2/4y40d-4y340d CS w/ any other existing sentence and the 6m imposed in Contempt docket 24-CM-00356 Rec'd amended mitt 07/15/25 798d/ct2/4y40d-4y340d CS w/ any other existing sentence and the 6m imposed in Contempt docket 24-CM-00356 PSI Investigation completed 12/16/2024 Count 2 PSI investigation 11/15/2024 | Macdonald, Heather | 10/10/2025 07:39 |
| Manual Adjustment | | Manual Credit | -104 | | | | | | | Both | -104 | | | | | | | Adjusting for remaining 6m imposed in CS docket 24-CM-00356 | | |
| Earned Time Credit | | Manual Credit | 2 | | | | | | | Both | 2 | | | | | | | ETC 01/25 | | |
| Earned Time Credit | | Manual Credit | 7 | | | | | | | Both | 7 | | | | | | | ETC 02/25 | | |
| Earned Time Credit | | Manual Credit | 7 | | | | | | | Both | 7 | | | | | | | ETC 03/25 | | |
| Earned Time Credit | | Manual Credit | 7 | | | | | | | Both | 7 | | | | | | | ETC 04/25 | | |
| Earned Time Credit | | Manual Credit | 7 | | | | | | | Both | 7 | | | | | | | ETC 05/25 | | |
| Earned Time Credit | | Manual Credit | 7 | | | | | | | Both | 7 | | | | | | | ETC 06/25 | | |
| Earned Time Credit | | Manual Credit | 7 | | | | | | | Both | 7 | | | | | | | ETC 07/25 | | |
| Earned Time Credit | | Manual Credit | 7 | | | | | | | Both | 7 | | | | | | | ETC 08/25 | | |
| Earned Time Credit | | Manual Credit | 7 | | | | | | | Both | 7 | | | | | | | ETC 09/25 | | |
| 20-CR-01502 Cncr RECKLESS ENDANGERMENT | 01/31/2025 | Concurrent | 875 | 01/31/2025 | 09/08/2022 | 0 | 0 | 0 | 0 | | 875 | 01/31/2025 | 09/08/2023 | 1 | 0 | 0 | 0 | 875d/ct2/0d-1y concurrent w/ any existing sentence | Hardy, John | 03/03/2025 15:15 |

### Overall Effective Sentence

| | YRS | MTHS | DAYS | HRS | Eff Sentence | #Days Credit |
|---|---|---|---|---|---|---|
| MIN  Rule: 2005 | 4 | | 40 | | 01/30/2025 | 858 |
| MAX  Rule: 2005 | 4 | | 340 | | 01/30/2025 | 858 |

| Sentence Information - Notice of Earned Time Credit Award |
| :---: |
| BUSWELL, MALACHI A  Jacket#: 80350 |

**Min Calculated Release Date:  12/18/2026**          **Max Calculated Release Date: 10/14/2027**